## IN THE MATTER OF MELVIN SILVERMAN, AN ATTORNEY AT LAW.

Argued March. 1, 1988—Decided. October 28, 1988.

194

*William R. Wood,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Roger A. Lowenstein* argued the cause for respondent (*Dickson, Creighton & Lowenstein,* attorneys).

PER CURIAM.

The unethical conduct at issue in this disciplinary proceeding arises out of respondent's participation in a business venture

with a former client and his testimony in the civil proceedings that resulted from it. The record before the Disciplinary Review Board (Board) consisted of a Presentment filed by the District IIB Ethics Committee (Committee), a detailed stipulation of facts entered into by respondent and the Office of Attorney Ethics (OAE), the proceedings and decision of the Client's Security Fund, and the record of the aforementioned civil trial. The Board concluded respondent had entered into an employment relationship with a client in violation of *DR* 5-101(A), conducted a business transaction with a client in violation of *DR* 5-104(A), committed numerous misrepresentations in the course of that transaction in violation of *DR* 1-102(A)(4), and had made several false statements under oath. Despite respondent's otherwise unblemished record both prior to and since the relevant events in this case, the Board recommended disbarment.

Our careful and independent review of the record leads us to accept in part and reject in part the Board's findings and recommendation. The Board's findings regarding respondent's misrepresentations and participation in a business transaction with a client are amply supported by the record, and indeed by multiple concessions found in the stipulation and respondent's brief. Further, we are in partial agreement with the Board's conclusions concerning the accuracy of respondent's sworn testimony. We cannot agree, however, that clear and convincing evidence establishes an attorney-client relationship concerning the relevant transaction, nor can we conclude that disbarment is warranted. Due to several mitigating factors, our judgment is that respondent's six-year suspension constitutes a discipline sufficient to protect the public.

I

Respondent was admitted to the bar of this State in 1970, and to the bar of the United States Patent and Trademark Office

two years later. His practice has consisted almost exclusively of matters in the patent field and has provided him with a modest income. Events relevant to this case began in late 1978 and were detailed by the Board as follows:

"On November 15, 1978, respondent entered into an agreement to purchase a large, prestigious patent agency known as Haseltine, Lake and Waters (HLW) from Eric Waters (Waters) for $750,000. Pursuant to the terms of the agreement, respondent was to pay Waters the sum of $350,000 at closing set for January 12, 1979; $130,000 on January 12, 1980; and additional, unspecified amounts over a number of years pursuant to a formula based upon past and future earnings of HLW.

"Respondent, a patent attorney with offices in Clifton, did not have the personal funds or assets necessary to obtain sufficient credit for the purchase of HLW. Consequently, it was respondent's intention to use HLW's accounts receivable and good will as collateral. However, attempts to borrow funds from commercial lenders proved unsuccessful.

"In January 1979 respondent had occasion to meet with Fred Ferber (Ferber), a client for whom respondent's law firm had performed patent work from 1973 through 1977. Although Ferber initiated the meeting to discuss a possible new patent, respondent soon told him about difficulties he was encountering in obtaining financing for the acquisition of HLW. At the time of this discussion Ferber, a famous inventor recognized as the father of the modern ball point pen, owned a substantial amount of real estate in New Jersey but was virtually cash poor and under tremendous financial pressure. He was 75 years old, his wife was seriously ill with cancer and he was in default on numerous debts including mortgages, real estate taxes and unpaid legal fees due and owing to respondent's law firm. Seeing the HLW transaction as an opportunity for him to alleviate his financial problems, Ferber agreed to allow respondent to use a 212 acre tract of his property as collateral for a $400,000 loan in exchange for money with which to pay his debts and meet living expenses.

"Armed with Ferber's pledge of collateral, in early February 1979 respondent prepared a prospectus to be used in support of his application for the $400,000 loan. This prospectus contained information concerning Ferber's and respondent's respective financial conditions. However, portions of the prospectus as well as the loan application contained information respondent knew to be false. Respondent admitted that '[t]he application contained exaggerations of Ferber's worth. Even though Ferber was dictating information, I realized there were exaggerations and there were * * * liabilities understated * * *.'

"Among the misrepresentations found in respondent's financial statement was an entry that his interest in the law firm of Silverman and Jackson was worth $165,000. However, the law firm had dissolved six months earlier in August 1978 and had no value. An additional entry placed a value of $20,500 on Technology Assistance Corporation, a company formed by respondent. However, the company had not been incorporated, owned no assets, had never

conducted any business and had no monetary value. Values of other assets were similarly misrepresented.

"The Ferber financial statement contained more serious misrepresentations. One entry listed the value of Ferber's patent rights in a process known as 'Protosoil' as $200,000, a figure respondent knew to be speculative. An additional entry indicated that Ferber had $65,000 cash on hand when respondent knew Ferber was cash poor. The financial statement also indicated that Ferber owned an art collection worth $40,000 and miscellaneous securities worth $60,000 when respondent knew that these entries were improbable at best. Moreover, the financial statement failed to list all of Ferber's liabilities, including accrued interest, at true value.

"On March 26, 1979, after the prospectus and financial statements had been presented by an intermediary, respondent formally submitted the loan application to Liberty Federal Savings & Loan Association (Liberty). The application referred the bank to a report on Ferber's income prepared by Ira S. Herman, C.P.A. (Herman), respondent's first cousin. In this report Herman indicated that Ferber's income during the six year period from 1973 through and including 1978 was $413,477 per year. This figure was based upon Ferber's sale of certain real estate to the State of New Jersey in 1973 for $2,800,000. In reality, however, Ferber had no source of income during the years in question and his net profit on the sale of the property, after the satisfaction of mortgages and liens, was less than $150,000. Respondent was fully aware of this misrepresentation at the time the report was prepared and submitted.

"The loan application contained several other misrepresentations of which respondent was aware. In one section, the application indicated that Ferber was not then a party to a law suit and that no properties owned by him were the subjects of foreclosure actions. However, at the time the application was filed respondent, on behalf of Ferber, was attempting to negotiate the settlement of a foreclosure action that had been filed against Ferber. The application further indicated that Ferber held $260,000 in stocks and bonds and had a net worth of $1,944,000 when respondent knew that both figures were exaggerated and constituted material misrepresentations.

"At the time respondent submitted the loan application, the New Jersey Usury Law limited interest on personal loans to a rate of 9½%. Since Liberty was issuing loans at a rate of 14%, respondent was advised that the loan could only be made to a corporation. Upon receiving this information, respondent conferred with Ferber and suggested that Ferber and his wife, Hedwig, convey title to the 212 acre tract into a corporate 'shell' known as Eastern Star Enterprises, Inc. (Eastern) which respondent had previously formed for other purposes.

"On or about April 10, 1979, respondent secured the Ferbers' consent to the proposed conveyance and prepared three corporate resolutions to facilitate the transaction. The first resolution named Fred, Hedwig and respondent as directors of Eastern. The second resolution appointed Fred as president, Hedwig as vice president and respondent as secretary. This resolution further provided for distribution of 500 shares each of authorized but unissued stock to Fred and Hedwig. The third resolution contained four provisions authorizing

the board of directors to apply for a loan of between $400,000 to $435,000; the corporation to accept title to the 212 acre property from the Ferbers; respondent to execute any and all documents necessary to effectuate the loan; and respondent to execute a note of not more than $85,000 to Waters to be secured by a mortgage against the 212 acre parcel.

"The deed conveying the 212 acre property from the Ferbers to Eastern was prepared by respondent and acknowledged by him on April 11, 1979. The Ferbers' signatures were purportedly witnessed by respondent's law partner. However, during the course of a civil trial concerning respondent's acquisition of HLW, the partner testified that he had not witnessed the deed and that the signature thereon was not his.

"From the time of their initial meeting in January 1979 through the preparation of the three corporate resolutions and execution of the deed, the Ferbers were without benefit of independent counsel and respondent failed to advise them that it was in their best interests to retain an attorney. It was not until after the corporate resolutions and deed had been signed that respondent advised the Ferbers to contact an attorney. In the interim, respondent, who has steadfastly denied representing the Ferbers in his capacity as an attorney, helped the Ferbers obtain additional mortgage monies with which to meet their everyday living expenses. Respondent's 'assistance' included negotiations to settle or forestall foreclosure actions involving various Ferber properties.

"On April 17, 1979, after finally being advised by respondent to secure his own attorney, Fred Ferber contacted William S. Robertson, Esq. (Robertson), an attorney from Wayne, New Jersey, who had represented Ferber in the past. On the following day, April 18, 1979, Robertson called respondent, advised him that he was representing the Ferbers and requested copies of any and all documents relating to the HLW acquisition. Respondent initially complied with Robertson's request by sending him a copy of the prospectus. Upon reviewing the document, Robertson advised respondent that the Ferber financial statement contained inaccuracies and strongly suggested that it be revised and resubmitted to all lenders. Respondent ignored Robertson's advice on the theory that since the lending institution would conduct its own appraisal of the 212 acre tract pledged as collateral, it was not necessary to bring these misrepresentations to its attention. In respondent's view, 'the areas which Robertson pointed out were—did not relate to any asset that the bank was relying upon, okay, although Ferber in—had valued and I had listed the property at a higher value the bank had done their own appraisal and come up with a value which, to them, was satisfactory. But this is how I rationalized it, wrong though it was.'

"On April 23, 1979, Liberty issued a letter of commitment to Eastern approving a first lien mortgage loan on the 212 acre property in the amount of $400,000 at an interest rate of 14% to be repaid in monthly installments based upon a 15 year pay-out but due in full in ten years. The commitment letter also set forth a number of conditions precedent including, but not limited to, the Ferbers' personal guarantees, cash collateral in the amount of $100,000 to be pledged by HLW or Waters, the Ferbers' tax returns for the preceding three years, and the Ferbers' certified financial statements.

"On April 25, 1979, respondent met with Robertson and Paul Alper (Alper), respondent's business consultant, to discuss the Ferbers' role in the HLW transaction. During that meeting, Robertson was advised that upon closing the Ferbers would receive $100,000 towards one mortgage; $10,000 towards another; $10,000 for living expenses; and a consulting contract with HLW worth $20,000 per year for each year the Liberty mortgage remained a lien on the Ferbers' property. Robertson was also advised that the Ferbers' maximum risk would actually be $180,000 as opposed to $400,000. Liberty would look first to the $100,000 cash collateral to be pledged by Waters, respondent or HLW, thereby reducing the Ferbers' exposure to $300,000. Additionally, the Ferbers would be receiving $120,000 in cash, thereby further reducing their exposure from $300,000 to $180,000.

"Later that same day, respondent met with Alper and Ferber in Robertson's absence. As a result of that meeting, respondent and Alper submitted a mortgage application on behalf of the Ferbers to Capital Mortgage Company seeking a $10,000 loan for general living expenses. On this application respondent knowingly misrepresented that Fred Ferber earned an annual income of $50,000.

"On May 2, 1979, respondent forwarded to counsel for Liberty much of the documentation required by the April 23, 1979, commitment letter. Copies of these documents were sent directly to Ferber and not to Robertson.

"On May 11, 1979, Robertson sent respondent a letter confirming their discussions during the April 25, 1979 meeting and reviewing certain aspects of the prospectus and agreement of sale. The letter pointed out a number of problems Robertson had with the Ferber financial statement contained in the prospectus. These problems included the gross overvaluation of Ferber's patent rights in 'Protosoil'; the listing of a nonexistent note receivable from HLW in the amount of $100,000; a listing of a nonexistent consulting fee of $18,500 receivable from HLW; the failure to list a mortgage of $120,000; and the listing of accounts payable of only $22,000 instead of the more than $55,000 previously indicated by respondent.

"On May 16, 1979, respondent received a commitment from Manufacturers Hanover Trust for a loan of $65,000 to his law firm. Unbeknownst to Robertson, the loan was to be guaranteed by the Ferbers. When the loan closed on June 29, 1979, Fred Ferber signed his name and forged his wife's signature. Although respondent was aware of the forgery, he did not inform his partner (who acknowledged the two signatures), Manufacturers Hanover or Robertson. In fact, he did not inform Robertson about the loan itself until the day of the HLW closing.

"On May 18, 1979, without prior notice to or consent from Robertson, respondent concluded negotiations with the mortgagee of the 212 acre tract resulting in the subordination of that mortgage to the proposed mortgage of Liberty. The subordination agreement, which respondent signed on behalf of Eastern, raised the interest rate on the remainder of Ferber's indebtedness from 8% to 14%. Upon completion, respondent forwarded a set of the documents to Robertson, advising him that the mortgagee's security interest in the HLW accounts receivable had been increased and that it would be necessary to

advance to Ferber the majority of his first two years of consulting fees ($40,000) in order to meet pressing needs.

"On May 24, 1979, after reviewing the 1978 financial statement of HLW prepared by William Kaufman, C.P.A. (Kaufman), Liberty revoked its commitment. Upon receiving notification of the revocation, respondent called Robertson and told him to stop all work. Respondent then wrote a letter to Liberty threatening suit and retained Robert L. McKinstry, Esq., an attorney on the board of directors of Liberty, and James D. Elleman to lobby for reinstatement of the commitment.

"In an attempt to repair the damage caused by the Kaufman analysis, respondent contacted his cousin Herman and had him prepare a report reviewing Kaufman's findings. This report, dated June 1, 1979, concluded that appropriate adjustments to some of Kaufman's figures would project a healthier financial condition. Respondent forwarded this report to Liberty on or about June 4, 1979. After conducting a supplemental investigation, Liberty reinstated its commitment on June 15, 1979.

"In early June 1979, Ferber's financial condition deteriorated to a point where he could not meet any of his current obligations. Respondent contacted Peter F. Mento, Jr. (Mento), a director of Interchange State Bank (Interchange), and negotiated a $3,000 loan to cover Ferber's living expenses. This loan, the proceeds of which were paid to respondent as trustee, was for a term of six months with an interest rate of 15%. As security, Ferber was required to execute a note and mortgage against his 18 acre property in West Milford Township. Respondent did not inform Robertson of this transaction.

"Respondent next turned his attention to the task of obtaining the $100,000 cash collateral required by Liberty. With the assistance of Alper and Anthony Santangelo (Santangelo), respondent approached a group of entrepreneurs collectively known as the Weir Group (Weir or Weir group). At a meeting held on June 7, 1979, Weir requested financial information. Respondent provided the original prospectus, the 1978 HLW financial statement prepared by Kaufman, the Ferber financial statement prepared by Herman dated April 30, 1979 and the 1976 and 1977 HLW financial statements.

"At the time he provided Weir with the requested documentation, respondent knew that much of the information contained therein was false and misleading. As previously indicated, the prospectus grossly exaggerated Ferber's assets and severely underestimated his liabilities. Similarly, the Ferber financial statement prepared by Herman falsely indicated that Ferber owned a note receivable in the amount of $100,000 from HLW and was to receive a consulting fee of $18,500 from HLW as well.

"Most egregious, the 1978 HLW financial statement prepared by Kaufman was altered by respondent before delivery to Weir. Knowing that this financial statement had in large part been responsible for the revocation of the Liberty commitment, respondent feared it would have a similar effect on the Weir Group. Therefore, certain pages were removed and others substituted. The original statement showed a net income figure of $140,554 for the year ending December 31, 1978. Respondent removed the page containing that information and substituted one of his own showing a total net income of $524,132. The

original financial statement also contained a page embodying a Statement of Changes in Financial Position. Since that page made reference to the net income figure of $140,554, respondent removed it, making no substitution. Respondent told no one about this alteration. At the civil trial, respondent testified that he was unaware that the financial statement had been altered.

"On June 11, 1979, the Weir Group issued a commitment letter to Eastern for a two year loan in the amount of $100,000 at 25% interest. The commitment required that the Weir Group receive a third mortgage on the 212 acre property; a second mortgage on a 113 acre property also owned by the Ferbers; a financial statement showing the Ferbers' net worth to be not less than $1,000,000; the Ferbers' personal guarantees of the loan; and a security interest in HLW's accounts receivable. In a side agreement it was also stipulated that the Weir Group would receive a 15% interest in HLW as additional compensation. At no time did respondent advise the Weir Group that Liberty had revoked its commitment on May 24, 1979 and had not reinstated same until June 15, 1987. When respondent negotiated this loan and ultimately° signed the commitment papers on behalf of Eastern, he did so without informing the Ferbers or Robertson.

"In an effort to obtain additional funding, respondent enlisted Mento's aid in securing a $60,000 loan from his bank. In exchange for a finder's fee of $3,600 plus an 8% interest in HLW, Mento agreed to assist in the placement of a loan with Interchange, where Mento served on the board of directors. On June 12, 1979, Mento issued a commitment letter to Eastern on Interchange stationery for a $60,000 loan payable in two years at 20% interest. Pursuant to the commitment, Interchange was to receive as security a second mortgage on the Ferbers' 18 acre property in West Milford, the Ferbers' personal guarantees of the loan and a sinking fund of HLW receivables. However, Interchange was not aware of and had not authorized Mento's commitment letter. Consequently, respondent and Mento entered into a side agreement which provided that respondent would not hold Mento liable on the Interchange commitment letter.

"On June 12, 1979, in order to comply with a deadline previously set by Waters' attorney, respondent sent this attorney a letter outlining his sources of funding for the acquisition. In this letter respondent indicated that he would be receiving $400,000 from Liberty; $100,000 from the Weir Group; $65,000 from Manufacturers Hanover Trust; and $60,000 from Interchange. Respondent enclosed copies of the April 23, 1979 commitment letter from Liberty, the June 11, 1979 commitment letter from the Weir Group and the June 12, 1979 commitment letter from Interchange. He did not indicate that Liberty had revoked its commitment on May 24, 1979 or that the Interchange commitment was unauthorized. Nor did he provide Robertson with copies of the June 12, 1979 letter to Waters' counsel or the commitment letters from Liberty, the Weir Group and Interchange.

"On June 15, 1979, Liberty reinstated its commitment to lend Eastern $400,000. Upon receiving notification of the reinstatement, respondent contacted Robertson and advised him that the transaction was still very much alive and that work could continue. Robertson renewed his request for copies of all documents related to the acquisition but respondent failed to honor this request.

"On June 20, 1979, respondent called Robertson with some of the details of the transaction Robertson had been requesting. Specifically, he advised Robertson that the Weir Group was making a $100,000 loan payable in two years; Waters had agreed to subordinate his lien on HLW's accounts receivable to the extent of $265,000; the Ferber's lien on the accounts receivable would exist through the mortgagee's lien; and Ferber would receive $140,000 at closing with $100,000 payable to the mortgagee and $40,000 representing the first two years of consulting fees payable to Ferber. Respondent also claimed that Ferber would have absolutely no exposure because he would be receiving a $165,000 lien on HLW accounts receivable through the mortgagee's lien. As respondent explained it to Robertson, Ferber's gross maximum exposure was $300,000 ($400,000 less the $100,000 cash collateral). Since Ferber was receiving $140,000 at closing, the balance of his exposure would be $160,000, which would be totally protected by Ferber's subordinated lien on the HLW receivables through the mortgagee.

"The exact date and time of the closing was undetermined until June 21, 1979. On that date Ferber called Robertson and advised him that the closing was to take place on the following day, June 22, 1979. Ferber also gave Robertson a telephone number at which respondent had told Ferber he could be reached. However, despite numerous attempts, Robertson was unable to reach him.

"On June 22, 1979, at 9:15 a.m., Robertson was finally able to reach respondent. At that time, Robertson advised respondent that since he had not been provided with all relevant paperwork, he had not had an opportunity to prepare a formal agreement between the Ferbers and respondent. Moreover, because he would not be available until later that afternoon, the closing would have to take place in escrow. Respondent assured Robertson that he would make his position known to all parties concerned. Respondent then advised Robertson of certain changes that had been made in the structure of the deal.

"Upon completing his conversation with Robertson, respondent, Herman and the Ferbers left for New York City to attend the closing. Immediately upon their arrival, respondent's associate took the Ferbers to a private social club. During the morning session of the closing, with Robertson unavailable, and in the Ferbers' absence, numerous provisions of the deal protecting the Ferbers were eliminated.

"Later that afternoon, it became obvious that the closing could not be held in escrow. Liberty had taken the position that respondent had to become owner of HLW in order to have the cash flow upon which the bank was relying as a condition of the loan. However, Waters would not transfer title unless and until he was paid. In addition, the mortgagee on the 212 acre tract needed his money immediately to meet other commitments and promised to foreclose if he did not receive the money as promised.

"At that point a telephone conversation was held among respondent, Robertson, Ferber and the other parties' respresentatives. Robertson reiterated that since he had not had an opportunity to review any of the paperwork, he could not advise his clients to go through with the closing. However, Ferber was under a great deal of pressure to close and insisted that Robertson find a way

to allow the closing to proceed to conclusion. After further negotiations, it was finally agreed that Robertson would draft a short form agreement between Ferber and respondent which he would dictate to a secretary in the closing office. Robertson again advised Ferber that this approach was inherently risky and that the better course would be to postpone the closing for a few days until he had an opportunity to review all of the papers. Nevertheless, Ferber stated that he was willing to rely on respondent's good judgment and would complete the closing upon execution of the short-form agreement which would contemplate revisions and additional documents.

"Sometime after 5 p.m. that afternoon, Robertson dictated a formal agreement which was ultimately signed by Ferber and respondent. Based upon Robertson's limited understanding of the various components of the transaction, the agreement contained the following provisions: (1) respondent was to pay $100,000 toward the mortgage on the 212 acre property; (2) Ferber was to receive a consulting contract paying $20,000 per year for as long as the Liberty lien remained in effect; (3) respondent was to assign a life insurance policy with a cash surrender value of at least $40,000 to Ferber as security; (4) the $100,000 cash collateral was to be the primary asset to which Liberty would resort in the event of a default and was not to be released without the Ferbers' consent; (5) Waters' lien on HLW's assets was to be subordinated to a security interest in HLW's accounts receivable in favor of the mortgagee and Weir in the amount of $265,000 which, in turn, was to provide that the Ferbers would have a primary security interest in these receivables by assuming the position of the mortgagee and Weir as their indebtedness was satisfied; (6) Liberty was to release the mortgage on the 212 acre property as soon as the total debt fell below the sum of $100,000; and (7) there had been no material adverse change in the financial condition of HLW since December 31, 1978.

"Unbeknownst to Robertson, shortly before executing this agreement with Ferber, respondent executed a closing agreement with Waters which specifically stated that there had been material adverse changes in the financial condition of HLW since November 15, 1978 due to the loss of a number of important clients and key employees. Additionally, before executing the agreement with Ferber, respondent unilaterally changed the amount of Ferber's security interest in HLW's accounts receivable from $265,000 to $165,000.

"At closing, respondent also agreed to two modifications of the June 11, 1979 side agreement proposed by the Weir Group. Pursuant to the initial modification, respondent delayed creation of the Weir Group's 15% interest in HLW until Waters was paid in full and agreed to pay the Weir Group $200,000 annually from HLW profits if the proposed partnership were not formed within four years. According to the second modification, respondent agreed to provide a principal of Weir with a four-year 'consulting contract' worth $227,500, the proceeds of which were to inure to the benefit of the Weir Group. In reality, this consulting contract was a subterfuge designed to circumvent the provision in the sale agreement prohibiting any assignment of respondent's interest in HLW while the purchase price remained unpaid. Respondent agreed to these two modifications without first advising or securing the consent of Robertson or Ferber.

"All of the elements of the HLW transaction, with the exception of the $65,000 loan from Manufacturers Hanover Trust and the $60,000 loan from Interchange/Mento, closed on June 22, 1979. The Manufacturers Hanover note, guaranteed by the Ferbers and payable on demand at 1½ points over prime, was executed on June 26, 1979. Respondent did not inform Robertson of that closing or of the fact that the Ferbers had guaranteed the note. The Interchange/Mento loan closed on July 12, 1979, at which time respondent signed a note obligating HLW, Eastern and himself to Mento. The proceeds of this loan were paid to Chemical Bank in discharge of one of respondent's obligations under the original agreement of sale. Respondent did not disclose the existence of this transaction to Robertson or Ferber, nor did respondent ever advise Robertson of the nature or extent of the finder's fees he had awarded to several other individuals.

"In or about mid-1980, although current on its payments to Liberty and the Ferbers, HLW fell behind on its obligations to the Weir Group, Mento and numerous trade creditors. Consequently, a group of creditors formed a creditors' committee. This committee, which in effect became a board of directors, assumed complete control over all financial decisions. Nevertheless, due to the overwhelming amount of debt incurred as a result of the transaction, HLW was compelled to file for bankruptcy in March 1981. As a result of the failure of HLW, the Ferber estate (Fred and Hedwig both died prior to the conclusion of the bankruptcy proceedings and related lawsuits) lost $267,500; the Weir Group lost $69,000; and the Mento estate (Peter Mento also died prior to the conclusion of the various legal proceedings) lost $50,000."

Respondent contended the failure of HLW was caused by Waters' fraudulent misrepresentations regarding its assets and liabilities; in the bankruptcy litigation Waters was sued by the trustee and settled the action with a payment of $50,000. Meanwhile, in consolidated civil proceedings, Liberty sought to foreclose against the 212-acre West Milford property that had been transferred to Eastern, while the Ferbers' estates asserted claims against Silverman for fraud and sought to invalidate the various mortgage agreements and Eastern debts. In that action Liberty recovered the full amount of the loan, and the Ferbers were awarded a $267,500 judgment against Silverman covering all losses to the estates. As of April 1987 respondent, through continuing monthly installments of $400 to $600, had paid off approximately $30,000 of the outstanding liabilities.[1]

---

[1]Although the Board found that $145,000 of the judgment was satisfied by other defendants, the record is unclear on whether this $145,000 payment to

No criminal proceedings were instituted, and a petition by Ferber's estate for recovery from the Client Security Fund resulted in the Fund declining to make any award.

On June 24, 1982, shortly after judgment had been rendered in the civil action, respondent consented to a voluntary suspension of his plenary license to practice. The Patent and Trademark Office, however, authorized respondent to continue practicing in agency matters, pending final outcome of this proceeding. Since then respondent has practiced before the Patent and Trademark Office without incident.[2]

In order to simplify the proceedings before the District Ethics Committee, respondent and the OAE prepared a stipulation laying out the transaction and respondent's role. The stipulation included respondent's acknowledgment that the facts and conclusions "demonstrate unethical conduct * * * which warrants public discipline." Subsequently, on November 19, 1986, the Ethics Committee commenced a hearing at which only respondent testified, and thereafter issued a presentment recommending public discipline. The presentment, dated February 27, 1987, charged that respondent had entered into a business transaction with a client who was relying on him to exercise his professional judgment, without making full disclosure or obtaining proper consent, in violation of DR 5–104(A), and that numerous instances of his conduct throughout the transaction amounted to violations of DR 1–102(A)(3) and (A)(4), rules proscribing, respectively, conduct "that adversely reflects on * * * fitness to practice law" and that "involv[es] dishonesty,

---

the Ferbers' estates represented independent damages or was credited to Silverman's liabilities.

[2]In the interim respondent has also taken and passed the Florida State Bar examination, including the required multi-state professional responsibility exam. Respondent stated that he awaits final judgment in this matter before applying for admission to the Florida bar.

fraud, deceit, or misrepresentation."[3] However, the Committee rejected charges that respondent had perjured himself before the client security fund and/or in the consolidated civil proceedings. Further, notwithstanding claims of the OAE to the contrary, the committee ruled that *DR* 5–101(A), a provision barring the acceptance of employment under circumstances likely to result in a conflict, was inapplicable due to the absence of any "factual basis for the conclusion that [respondent] affirmatively undertook to represent" anyone other than himself in the HLW acquisition.

The Disciplinary Review Board agreed with Committee's findings concerning *DR* 1–102(A)(3), (4) and *DR* 5–104(A), but differed with respect to its conclusions regarding respondent's alleged violations of *DR* 5–101(A):

> The Board, however, does not agree with the committee's finding that there was no affirmative undertaking by respondent to represent Ferber and, therefore, no violation of *DR* 5–101(A). Representation is inherently a consensual relationship founded upon the lawyer affirmatively accepting a professional responsibility. Such "acceptance need not necessarily be articulated in writing or speech but may, under certain circumstances, be inferred from the conduct of the parties." *In re Palmieri*, 76 *N.J.* 51, 58–59 (1978).
>
> When respondent first discussed the acquisition of HLW with Ferber in January 1979, Ferber's status was that of an occasional client. In fact, at that particular point in time, Ferber owed respondent's law firm a substantial amount of legal fees which had been incurred in the process of securing the "Protosoil" patent. Ferber was 75 years old, broke in terms of spendable cash and in default on numerous debts, including mortgage and real estate tax payments on his rather substantial land holdings. In particular, Ferber was in default on secured and unsecured loans to the mortgagee who held a first mortgage on the 212 acre property. Ferber was also in default on a first mortgage on a 31 acre property which was in foreclosure.
>
> Ferber was willing to allow respondent to use his property as collateral in exchange for money with which to live. Therefore, respondent engaged in many attempts to forestall execution of the foreclosure and the institution of additional foreclosure actions until the HLW closing, when the liens on Ferber's properties were to be paid. Although respondent claims he did not represent Ferber in connection with the existing and potential actions, and was acting

---

[3]The Committee properly looked to the former Disciplinary Rules, since the relevant events occurred prior to the effective date of the new Rules of Professional Conduct, September 10, 1984.

solely as a co-venturer to "keep the wolves from Ferber's door" for as long as possible, these negotiations with the lien-holders and additional actions taken on the Ferbers' behalf were indicative of an attorney-client relationship.

There can be no doubt, for example, that respondent was acting in his capacity as an attorney for the Ferbers and/or Eastern when he prepared the deed conveying title to the 212 acre property from the Ferbers to Eastern and then drafted the corporate resolutions necessary to facilitate the transaction. Nor can there be any doubt that respondent was also acting in his capacity as Ferber's attorney when, in June 1979, he negotiated with Mento to secure a $3,000 loan to meet Ferber's living expenses. Although it is not clear whether respondent formally drafted the mortgage and notes securing the loan, he negotiated the terms of the loan and advised Ferber to execute the documents. There is no evidence that respondent fully disclosed to Ferber the full extent of his own financial, business and personal interests in these numerous transactions.

Moreover, respondent continued to act as Ferber's *de facto* attorney even after Ferber retained Robertson as his independent counsel. Although he advised Ferber to retain his own attorney, he repeatedly ignored Robertson and continued to work and communicate directly with Ferber. Respondent's intentional failure to provide Robertson with essential information, as well as his continuous discussions with Ferber, fostered an environment in which Ferber could turn only to respondent for advice, particularly at a time when their respective interests were in obvious conflict. Consequently, the Board concludes that respondent violated *DR* 5–101(A) in that he affirmatively represented Ferber when he knew or should have known that his representation would be affected by his own personal interests and failed to fully disclose this fact to his client.

The Board also disagreed with the Committee's rejection of the OAE's assertion that respondent had perjured himself, finding that "the record * * * demonstrates that respondent, on more than one occasion, knowingly made false statements under oath to avoid liability for his actions." Its findings in this regard were based on a comparison between portions of respondent's testimony before the Client Security Fund and in the aforementioned consolidated civil proceedings, and statements in the stipulation:

Respondent intentionally withheld the June 12, 1979 letter outlining his sources of funding from Robertson because of his fear that upon examining same Robertson would advise Ferber to withdraw from the transaction. Although he did give a copy of this letter to Ferber, respondent knew Ferber would not understand or appreciate its importance and, therefore, would not forward it to Robertson. In fact, in his testimony before the committee, respondent admitted that he had conveyed his misgivings about Robertson to Ferber and that Ferber had said he would "take care of him." Based upon this

conversation with Ferber, respondent was confident Ferber had no intention of providing Robertson with any information regarding the transaction.

However, in prior testimony at the civil trial, respondent testified that he had assumed Ferber would deliver the letter to Robertson and had, in fact, instructed him to do so. Then, in subsequent proceedings before the Trustees of the Clients' Security Fund, respondent testified that he had had no reason to believe Ferber would fail to deliver the letter or reveal its contents to Robertson. When confronted with these inconsistent statements, respondent was constrained to admit his testimony before the Clients' Security Fund "could have been expressed, perhaps, with greater candor" and that "the Stipulation (entered into with the Office of Attorney Ethics) is a more candid expression of what I knew of Ferber's modus operandi with Robertson." More importantly, when questioned about his statements at the civil trial, respondent fully admitted that his "testimony was false, it's shaded, it was not as candid as the subsequent testimony."

Respondent was also less than truthful in his prior testimony concerning the sanitizing of the 1978 HLW financial statement prepared by Kaufman. Although he had personally deleted the two pages referring to the net income figure of $140,544 and substituted the page showing a net income figure of $524,132, at the civil trial respondent testified that he had been totally unaware of the document had been altered. When confronted with this statement at the hearing before the district ethics committee, respondent denied having perjured himself but allowed that his civil testimony "would have to be somewhat changed in its shading." [4]

Turning to the appropriate discipline, the Board noted respondent's contention that his conduct was affected by his "obsession" and "frenzy" to purchase HLW, but discounted its significance. Citing its findings concerning respondent's allegedly false testimony, the Board reasoned that his "unethical behavior was not limited to this one 'unfortunate period' in 1979." In sum, the Board concluded that despite "respondent's prior unblemished record, the totality of his misconduct leaves [us] without any confidence that respondent could ever again prac-

---

[4] As discussed *infra* at 222–224, the Board's characterizations of respondents' testimony in the civil proceeding and in the Committee hearing regarding the alteration of the Kaufman statement are incorrect. The record in the civil proceeding reveals that at one point respondent acknowledged changes in the Kaufman statement. Moreover, before the Committee respondent's testimony was that *the statement in the stipulation concerning his testimony* "would have to be somewhat changed in its shading," and not, as the Board asserted, the civil testimony itself.

tice law in conformity with the standards of the profession," and consequently, recommended disbarment.

## II

Ten years ago this Court reiterated Justice Jacobs' advice "that society might be 'better served if practicing attorneys were to remain full-time lawyers rather than become part-time businessmen.'" *In re Palmieri*, 76 *N.J.* 51, 53 (1978) (quoting *In re Carlsen*, 17 *N.J.* 338, 346 (1955)). This warning was premised on the fact that attorneys who choose to engage in commercial pursuits do not "shed in chameleon fashion" their status and concomitant professional obligations. *In re Carlsen, supra*, 17 *N.J.* at 346. Rather, such "[a]ttorneys are held to a higher standard than that of the market place * * * [and their] conduct must measure up to the high standards required of a member of the bar even if [their] duties in a particular transaction do not involve the practice of law." *In re Reiss*, 101 *N.J.* 475, 488 (1986); *accord In re Smyzer*, 108 *N.J.* 47, 57 (1987); *In re Hurd*, 69 *N.J.* 316, 330 (1976).

### DR 1-102(A)(3), (4)

Our independent review of the facts admits of no conclusion other than that respondent committed numerous ethical transgressions, demonstrated by clear and convincing evidence in the record. In his zeal to obtain adequate financing to consummate the acquisition of HLW, respondent prepared various statements and documents containing knowing misrepresentations of highly material facts. For example, in the prospectus, containing both his and Ferber's financial statements, and on the Liberty Loan application, respondent exaggerated or created non-existent assets and ignored or understated significant liabilities. Respondent altered the net income figure of the Kaufman 1978 HLW financial statement and, along with the prospectus, submitted it to the Weir group; respondent also altered, without Ferber's knowledge, a key figure on the closing memorandum agreement dictated by Robertson.

Further, several misrepresentations were effected by omissions on respondent's part: (1) in his June Twelfth letter to Waters respondent enclosed the Liberty commitment letter without disclosing that it had been revoked; (2) at the closing respondent signed the Robertson memorandum, which stated *inter alia* that there had been no material adverse change in HLW's financial condition since the first of the year, but failed to reveal that he had executed an agreement with Waters acknowledging the alleged existence of such adverse change; and (3) respondent withheld from Ferber and Robertson many of the details concerning side agreements he had made with Mento, Weir, and others that affected the stability of HLW. Respondent also acquiesced in Ferber's forgery of his wife's signature on the Manufacturers Hanover loan guarantee.

These omissions and affirmative misrepresentations, intended by respondent to induce favorable decisions by the various parties, were egregious and fraudulent and constituted clear violations of *DR* 1–102(A)(4).[5] Moreover, several of these incidents were, in all likelihood, criminal acts adversely reflecting on respondent's fitness to practice, and thus constituted independent violations of *DR* 1–102(A)(3).[6] See *N.J.S.A.* 2C:21–7 h (fourth degree offense to "make a false or misleading statement for the purpose of obtaining * * * credit"); *N.J.S.A.* 2C:21–1 a(1–3) (fourth degree offense to (1) alter or change "the writing of another without his authorization," or to utter a writing known to have been executed "so that it purports to be the act of another who did not authorize that act.").

[5]"A lawyer shall not * * * [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Rule 8.4(c) of the Rules of Professional Conduct is nearly identical.

[6]"A lawyer shall not * * * [e]ngage in illegal conduct that adversely reflects on his fitness to practice law." Rule 8.4(b) of the Rules of Professional Conduct proscribes the commission of criminal acts that reflect adversely on a lawyer's "honesty, trustworthiness or fitness as a lawyer in other respects."

Respondent offers various asserted justifications and explanations for these actions. At the Committee hearing respondent testified that while at the time he prepared the prospectus he realized Ferber had apparently supplied him with false financial information, it was not until Robertson became involved that he "had any way of knowing definitely, absolutely." And then, despite written notification from Robertson regarding specific errors, respondent stated, "I was not about to say to Liberty 'please revoke your commitment. There's been a material misrepresentation in Ferber's net worth,' particularly in that Liberty had their own appraisal done of the collateral property." Concerning the alterations of the Kaufman financial statement, respondent testified that he felt the use of a cash basis to compute HLW's 1978 net income represented "a calculated effort [by Waters' attorney] to torpedo the transaction," and that the new figures, derived from an accrual basis analysis provided to respondent by his accountant, were legitimate. Further, with respect to the alteration of the closing memorandum prior to Ferber executing it, respondent suggested that the figures supplied by Robertson were based on a miscalculation of Ferber's unsecured exposure on the loan, and that Robertson himself had previously assented to the validity of the corrected figure. Finally, as far as his failure to tell Ferber and Robertson of the Waters' closing memorandum alleging that adverse change in HLW's finances had occurred, respondent expressed that he considered the change immaterial, such that the "no material change" representation in the Robertson closing memorandum was more accurate.

■ Quite clearly, respondent's rationalizations for these acts are unavailing, and neither lessen their seriousness nor constitute a defense. *DR* 1-102(A)(4) simply proscribes conduct that knowingly is dishonest, fraudulent, deceitful, or involves misrepresentation. *E.g., In re Kotok,* 108 *N.J.* 314, 327 (1987) (providing knowingly false answer on handgun permit application, even if not done with "obvious purpose to mislead," violates *DR* 1-102(A)(4)); *see In re Servance,* 102 *N.J.* 286, 294

(1986) (*DR* 1–102(A)(4) violated where attorney represented investments were sound although "he knew little or nothing about them"). "A lack of honesty is a serious character flaw, intolerable in the professional makeup of an attorney." *In re Pleva,* 106 *N.J.* 637, 645–46 (1987). Respondent's personal belief that the information he misrepresented and/or concealed from the other parties was insignificant under the circumstances no more negates the improper and unethical nature of these acts than does the fact that an attorney who misappropriated client funds merely intended to borrow rather than steal. *See, e.g., In re Warhaftig,* 106 *N.J.* 529, 533–34 (1987); *In re Noonan,* 102 *N.J.* 157, 159–160 (1986).

■ As for preparation of the prospectus and financial statements, even if we credit respondent's testimony that at the time he only suspected Ferber had provided him with incorrect financial information, his decision to submit the documents to Liberty without even attempting to verify the validity of such information evinces a sufficiently reckless disregard for the truth of the prospectus to constitute dishonest and deceitful conduct. *E.g., In re Servance, supra,* 102 *N.J.* at 294; *In re Wolk,* 82 *N.J.* 326, 329 (1980). Furthermore, respondent misrepresented information concerning *his own* financial position on the prospectus.

## DR 5–104(A)

■ We also find, as did both the Committee and the Board, that respondent's entire course of conduct in dealing with Ferber clearly violated *DR* 5–104(A), a rule instructing that lawyers "shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client had consent-

ed after full disclosure." [7]  Although at the time respondent first discussed the HLW transaction with Ferber he was not actively representing him in a specific matter, it is clear that the two related to each other generally as attorney and client. It is also clear that it is the substance of the relationship, involving as it does a heightened aspect of reliance, that triggers the need for the rule's prescriptions of full disclosure and informed consent. *See In re Wolk, supra,* 82 *N.J.* at 332-33; *In re Makowski,* 73 *N.J.* 265, 268-69 (1977); *In re Hurd,* 69 *N.J.* 316, 329-330 (1976). Hence, there is little doubt that respondent engaged in a business transaction with a client; indeed, he conceded as much in his testimony before the Committee when he stated that he felt Robertson's appointment "removed [him] from the attorney role vis-a-vis Ferber."

The dynamics of the transaction clearly gave rise to differing interests on Ferber's and respondent's behalf, as the two were in effect aligned, respectively, as lender and borrower. *See In re Smyzer, supra,* 108 *N.J.* at 54-56 (differing interests involved where attorney counseled clients to invest in financially-troubled companies in which he held an interest); *In re Wolk, supra,* 82 *N.J.* at 333-34 (*DR* 5-104(A) applicable where client invested $10,000 on second mortgage for rental property owned in part by attorney); *In re Makowski, supra,* 73 *N.J.* at 267-69 (*DR* 5-104(A) applied to loans from client to attorney). Further, Ferber was undoubtedly relying throughout on respondent's good judgment; the record reveals that even at the

---

[7]Rule 1.8(a) now governs this particular area of professional responsibility, in a somewhat stricter manner:

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless (1) the transaction and terms in which the lawyer acquired the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in manner and terms that should have reasonably been understood by the client, (2) the client is advised of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent counsel of the client's choice on the transaction, and (3) the client consents in writing thereto.

closing, long after Robertson had been retained, Ferber felt he could act on respondent's advice. *Cf. In re Servance, supra,* 102 *N.J.* at 294 (history of honesty and faithfulness leads clients to trust attorneys with their property); *In re Palmieri, supra,* 76 *N.J.* at 59 (evidence failed to support any inference that asserted client relied on respondent "in any professional capacity"). Before the Committee respondent conceded that although at the time of the transaction he viewed Ferber strictly as a co-venturer, in retrospect "there can be no question" that Ferber relied upon him in a personal capacity and as an attorney.

Hence, inasmuch as respondent entered a business transaction with a client, where the two had differing interests and the client relied on him to exercise good judgment for the client's protection, it was incumbent on him to make full disclosure concerning all aspects of the transaction. *E.g., In re Smyzer, supra,* 108 *N.J.* at 54–56; *In re Wolk, supra,* 82 *N.J.* at 332–34; *In re Makowski, supra,* 73 *N.J.* at 268–69. Unlike the concealment involved in *Smyzer, supra,* respondent's interest in the HLW transaction was fully disclosed. However, from the onset of negotiations with Ferber he failed to reveal important details of his arrangements with the other parties, details that significantly affected HLW's prospective cash flow and thus directly related to the financial soundness of the deal as far as Ferber's interests were concerned.[8] *See In re Wolk, supra,* 82 *N.J.* at 332 (*DR* 5–104(A) violated where respondent told client of interest in transaction but failed to disclose crucial, adverse

---

[8]For example, respondent failed adequately to disclose the following details to either Robertson or Ferber: (1) Various finders fees to be paid out of the HLW cash flow, (2) the necessity to secure the Weir loan with second and third mortgages on various Ferber properties, and (3) arrangements with the Weir Group involving substantial payments in lieu of a promised 15% interest in HLW. Respondent's contention that these omissions were harmless because there was no equity in the land left to mortgage, and because the promised payments were subordinated to Ferber's security in the HLW cash flow are wholly unpersuasive. *See infra* at 216.

financial information); *In re Makowski, supra,* 73 *N.J.* at 269 (failure to disclose specifics of loan transactions with client violates *DR* 5-104). Respondent thus clearly failed to "take every possible precaution in ensuring that his client [was] fully aware of the risks inherent in the proposed transaction." *In re Smyzer, supra,* 108 *N.J.* at 55.

Respondent of course did, sometime in mid-April 1979, advise Ferber to retain independent counsel. The fundamental ethical objective at stake, however, dictates that such advice should have been given to Ferber in January 1979 when the two first discussed the possibility of joint participation in acquiring HLW. *See Smyzer, supra,* 108 *N.J.* at 54-55 (attorney contemplating business transaction with client "must carefully explain * * * the need for independent legal advice"); *In re Wolk,* 82 *N.J.* at 334 (counsel "should have insisted" client retain independent counsel); *In re Hurd,* 69 *N.J.* at 329 (although no attorney client relationship existed, counsel should have refused to go forward with transaction until independent legal advice had been obtained). As we explained in *Wolk, supra:*

> Lawyers have a duty to explain carefully, clearly and cogently why independent legal advice is required. When a lawyer has a personal economic stake in a business deal, he must see to it that his client understands that his objectivity and his ability to give his client undivided loyalty may be affected. [82 *N.J.* at 333.]

Here the record reveals that before respondent advised Ferber to retain independent counsel, the two had negotiated the specifics of Ferber's end of the deal and implemented the transfer of Ferber's real estate to Eastern. Further, respondent had allowed Ferber to participate in the submission of the fraudulent prospectus to Liberty. The importance of obtaining outside counsel prior to these events is painfully clear. *Cf. Wolk, supra,* 82 *N.J.* at 334 (noting pitfalls of transaction that independent counsel would have discovered).

Nor did Ferber's retention of Robertson cure respondent's violation of *DR* 5-104(A), since his subsequent concealment of material information effectively neutralized Robertson's usefulness to Ferber. *Cf. Smyzer, supra,* 108 *N.J.* at 55 (disclosure

requirement not satisfied by *pro forma* suggestion regarding outside counsel); *In re Wolk, supra,* 82 *N.J.* at 333 (rejecting sufficiency of advice concerning outside counsel "designed to protect [respondent] rather than his client"). Respondent's decision to withhold financial data because he felt that they (a) were unimportant as far as Ferber's interests, or (b) would lead Robertson to "torpedo the deal," preempted the precise tasks outside counsel is charged with in such situations. The Rule pre-supposes that counsel's interest in the transaction renders him objectively incapable of deciding what information is important as far as his client/co-venturer's interests are concerned, and whether or not he should consummate the transaction. Rather, these tasks are best left to outside counsel, who should advise against moving forward if it is determined that the transaction is not in the client's best interests.

### DR 5-101(A)

The Board, as noted above, rejected the Committee's finding that no specific attorney-client relationship existed concerning the HLW acquisition, and concluded that aside from *DR* 5-104(A) respondent had also violated *DR* 5-101(A). *Supra* at 207-209. This rule focuses on the propriety of an attorney-client relationship itself, and requires full disclosure and client's consent if the lawyer's professional judgment concerning the subject matter of the employment relationship "will be or reasonably may be affected by his own financial, business, property, or personal interests." *DR* 5-101(A).[9]

In addressing this issue the Board properly looked to *In re Palmieri, supra,* where, while noting that representation is essentially " 'an aware consensual relationship,' " we stressed that an attorney's acceptance of obligations in his professional capacity "need not necessarily be articulated, in writing or speech but may, under certain circumstances, be inferred from the conduct of the parties." 76 *N.J.* at 58-59; *see In re*

---

[9]This Rule is now covered by RPC 1.7(b).

*Makowski, supra,* 73 *N.J.* at 268–69. The Ethics Committee concluded that in seeking to acquire HLW respondent represented no one but himself, and further, found no factual basis to infer any affirmative undertaking to represent Ferber. The Committee expressed the view that

[t]he gravamen [sic] of respondent's improper conduct concerning Ferber was the entry into a business transaction with Ferber without the latter having separate counsel and while Ferber was relying upon respondent for advice. We distinguish such from an affirmative undertaking by respondent to represent to Ferber as to which we find no such facts.

However the Board, citing respondent's attempts to delay adverse action by various mortgagees, attempts to help Ferber obtain additional mortgage monies, and preparation of the deed and corporate resolutions involved in transferring the property to Eastern, concluded that respondent had "affirmatively represented" Ferber.

Although the matter is not free from doubt, on a close and careful examination of the record we differ with the Board to the extent it determined there was an attorney-client relationship between respondent and Ferber with respect to the transaction itself. We conclude that the existence of such a specific professional relationship within the meaning of *DR* 5–101(A) is not supported by clear and convincing evidence. However, limited to the specific matters cited by the Board, we agree that respondent entered into an attorney-client relationship with Ferber.

■ Looking first at Ferber's participation in the transaction, the record neither suggests that any express employment agreement existed between the two, nor does it sufficiently establish a professional relationship by implication. *See In re Palmieri, supra,* 76 *N.J.* at 59 (proof insufficient to infer existence of attorney client relationship). Respondent had never performed corporate or commercial work for Ferber; indeed Ferber knew he practiced exclusively in the field of patents. Moreover, Ferber knew from the outset that the objective of the transaction was to procure sufficient financing for respon-

dent to purchase HLW. Thus whether or not Ferber was a sophisticated businessman, as respondent contends, it is difficult to imagine that Ferber could reasonably have assumed respondent was acting as *his attorney* in negotiating the terms of the acquisition. *Cf. Ellenstein v. Herman Body Co.*, 23 *N.J.* 348, 353 (1957) (noting importance of inferring what parties contemplated in deciding whether a professional relationship was established). *Compare In re Wolk, supra*, 82 *N.J.* at 330–35 (no *DR* 5-101(A) violation found where client knew of attorney's interest in transaction) *with In re Makowski, supra*, 73 *N.J.* at 267–69 (finding attorney-client relationship and violation of *DR* 5-101(A) where client was wholly unaware of counsel's interest in investments). The hypothesis that the parties contemplated that respondent would act as Ferber's counsel regarding his participation in the transaction is further rebutted by Ferber's subsequent decision to retain Robertson, and indeed by evidence indicating that even before obtaining Robertson as independent counsel Ferber had sought other outside legal and financial advice.

■ However, we find that an attorney-client relationship did arise by implication regarding the collateral matters cited by the Board. Respondent's preparation of the deed and corporate resolutions used to transfer Ferber's property to Eastern were peculiarly legal tasks carried out by respondent primarily for Ferber's benefit, *i.e.*, so that Ferber could carry out his side of the bargain by mortgaging his land. Respondent's undertaking to provide the requisite legal skills for Ferber triggered the obligations of a professional relationship. *In re Makowski, supra*, 73 *N.J.* at 269 (citing *Shoup v. Dowsey*, 134 *N.J.Eq.* 440, 475–80 (Ch. 1944)).

Respondent's actions in negotiating with various mortgagees in order to delay action in foreclosure proceedings and in seeking a small loan for Ferber are more difficult to evaluate, as they were activities that a lay co-venturer could rightfully pursue in the interest of furthering the enterprise. The mere

fact that these activities are often undertaken by an attorney acting in his professional capacity does not in itself, in such a situation, create an employment relationship. *Cf. Ellenstein v. Herman Body Co.*, *supra*, 23 *N.J.* at 352 (attorney-client relationship not created simply because attorney deploys legal knowledge in completing work "which inherently is not the practice of law"). We are convinced, however, that Ferber believed respondent would exercise his legal skills for his benefit in carrying out these collateral tasks, and effectively relied on him to act as his attorney. *Cf. In re Palmieri*, *supra*, 76 *N.J.* at 60 (imposition of professional obligations requires "identifiable manifestation" that client relied on attorney in his professional capacity).

Nevertheless, despite our agreement with the Board that respondent entered into a limited professional relationship concerning these various matters, we do not find that such representation violated *DR* 5-101(A). As noted above, Ferber was aware of respondent's role as a principal from the outset, but was satisfied with respondent's professional role in these tasks. Thus, Ferber impliedly consented to the limited attorney-client relationship. Further, with regard to these specific ministerial tasks, there is no evidence that Ferber's and respondent's interests were different. Therefore, we are not persuaded that there was, or reasonably could have been, an adverse effect on respondent's professional judgment.[10] Hence, we cannot conclude by clear and convincing evidence that respondent's actions in carrying out these collateral tasks violated *DR* 5-101(A).

## False Swearing

We partially differ with the Board's conclusion that the record established clearly and convincingly that respondent was

---

[10]Had respondent undertaken affirmatively to represent Ferber in the transaction itself, the effect on his professional judgment would be clear. *See supra* at 214.

guilty of making knowingly false statements under oath in the Liberty/Ferber civil action and Client Security Fund proceeding. Our disagreement here results not from any clear error by the Board, but simply from our duty independently to scrutinize the record in disciplinary matters, as well as the inherent difficulty of proving false swearing charges.

As noted by the Board, respondent's June Twelfth letter to Waters' attorney outlining the committed funding sources was given to Ferber but not to Robertson, and respondent has stipulated "it was improbable" that Ferber would forward the document to Robertson. However, at the 1982 trial respondent testified that he told Ferber to give the document, along with other materials, to Robertson, and that he assumed Ferber would do so. Further, although respondent stipulated that Ferber recognized Robertson would counsel against the deal and agreed "to take care of" him, respondent testified at the Client Security Fund hearing that he "had no idea that Mr. Ferber was not communicating the substance of our various discussions to his attorney."

We cannot conclude that this constitutes clear and convincing evidence that respondent knowingly lied under oath. The testimony related to respondent's recollection of his state of mind in 1979 regarding Ferber's state of mind concerning what Ferber might or might not do with a package of materials. The record indicates that Ferber and Robertson were in frequent contact during this period, and despite respondent's conceded knowledge that Ferber intended to keep Robertson somewhat at a distance, he may well have believed when testifying that the substance of their discussions was being relayed to Robertson, including the fact that Ferber had received the above-mentioned package of materials. Further, the transaction at issue was somewhat complex, involving multiple parties and a large number of relevant dates, events, and documents; yet some of the pertinent testimony was framed in terms of generalities and thus imprecise. Respondent's recognition today that it was unlikely Ferber would give the June Twelfth Waters' letter to

Robertson, and that therefore his testimony was incorrect, does not ineluctably lead to the conclusion that he believed it was false when given. *See N.J.S.A.* 2C:28–2a (false swearing requires contemporaneous belief that testimony is false); *State v. Boratto*, 80 *N.J.* 506, 515 (1979) (same).

The other asserted incident of false testimony invoked by the Board, concerning respondent's role in the alteration of the Kaufman 1978 HLW financial statement, is not so easily explained. Respondent admits that he removed various pages from the statement and inserted a statement he prepared with a different net income figure, derived from a report compiled by his accountant using accrual-basis analysis. The alteration of this document was a topic of some concern at the 1982 trial, and came up at several points in respondent's testimony. Initially, respondent flatly denied he had altered the statement, but seemed to concede it had been tampered with prior to its submission to Liberty and the Weir Group:

Q. Referring you to S–39, there is a statement of income showing total net income of $524,132. Now, which of these two statements, the one showing $524,000 or the one showing $140,000, was the one you received from Mr. Tannenbaum?

A. What I received had the $140,000 in there, in some reference.

Q. Do you find $140,000 referred to it all on S–39, on the statement of income?

A. On this page.

Q. Yes, on that page.

A. On this page—I don't know about the rest of the document this page—it is not here. I don't see it on this page.

Q. Didn't you prepare this page, Mr. Silverman?

A. No.

THE COURT: Referring to a page in S–39?

Mr. SIMON: Yes.

A. I didn't prepare this page.

Q. Did you receive this page from Mr. Tannenbaum?

A. I think that that page came from some financial source. Whether it was Tannenbaum or whether it was Alper or Herman or who, but as a loose document, some time I saw this page.

Q. Well, so this page, this S–39 was not a part of the statement that you received from Mr. Tannenbaum, is that correct?

A. I don't believe so.

Yet at two subsequent points, once during cross-examination and once on redirect, respondent denied having any knowledge of the alteration whatsoever:

Q. Did you ever see this document containing the $524,000 figure before this case started? .

A. Before this case started?

Q. Yes.

A. No.

   *  *  *  *  *  *  *  *

Q. Mr. Silverman did you ever change any financial information that was given to you by Mr. Tannenbaum?

A. No.

To be sure, this testimony was elicited from respondent in his capacity as a civil defendant, in the course of a complex trial spanning three weeks. Indeed, before the Ethics Committee respondent suggested that he was confused at trial when confronted with these documents. Primarily, however, respondent asserts that while testifying at trial he believed the inserted page had been "developed by Herman as part of his analysis," and thus when he denied preparing the inserted page himself, it was not knowingly false testimony:

At the trial I testified as I was best able to recall at that instant. I was asked a question about a subject that I had not seen nor heard or not thought about of for more than three years. So my response at trial in response to whatever was asked to me was not—not wrong, not false, it's to my knowledge at that moment or instant of being questioned.

We find respondent's explanation of the testimony not credible. His assertion that at the time he believed Herman had prepared the page is belied by his testimony during another point in cross-examination:

Q. [D]id you ask [Herman] or anyone else to take the figure shown on this letter and put them into—and revise or change the Kaufman page on income?

A. I don't believe so.

Q. You don't believe so?

A. What I think, some of the consultants might have done was to make up, you know, their own notes.

Q. By consultants—.

A. I don't know if it was Mastronardo or Alper. During this period those would have been the two that were closest to me.

Q. Did you talk to them about taking these figures that Herman had given you and making the revised statement of income?

A. No, because it would have been of no assistance because of what Liberty had already communicated.

Q. I'm not asking about Liberty; I'm asking—

A. The answer is no.

Q. —about whether or not you asked anyone, Alper or Mastronardo or Herman, or anyone else, to take the figure shown on this June 1 '79 letter and put them into and develop a new income statement?

A. No.

Q. *Do you know whether anyone did it on their own?*

A. *I don't know.* [Emphasis added.]

Moreover, even if respondent did mistakenly believe at the time of trial that Herman had prepared the page and that he had only attached it to the Kaufman statement, he could not truthfully testify that he had never seen the altered document before the case started, and that he never changed any of the financial information given to him by Tannenbaum. *See supra* at 222. Hence, on this matter we agree with the Board that respondent gave knowingly false testimony. *See, e.g., State v. Boratto, supra,* 80 *N.J.* at 515 (witness' contemporaneous knowledge of falsity "may be inferred from surrounding circumstances," such as "the objective falsity itself, a motive to lie, or facts tending to show generally that defendant knew that his affirmation was false"); *see also In re Reiss, supra,* 101 *N.J.* at 491 (finding that attorney had filed knowingly false certification where he previously had represented the plaintiff in a different civil action but filed a certification denying he had ever represented the plaintiff in order to enable him to continue representing defendant).

■ We turn now to the appropriate discipline. Our primary objective is, as always, protection of the public and preservation of its confidence in the integrity of the bar, rather than punishment of the errant attorney. *E.g., In re Stier,* 108 *N.J.* 455, 460 (1987); *Matter of Noonan, supra,* 102 *N.J.* at 165; *In re Kushner,* 101 *N.J.* 397, 400 (1986); *In re Wilson,* 81 *N.J.* 451, 456 (1979). We examine the nature of the crime or misconduct and the extent to which it arises out of or relates to the practice of law, and consider pertinent evidence of mitigation. *See*

*Stier, supra,* 108 *N.J.* at 457; *In re Kotok, supra,* 108 *N.J.* at 327; *In re Kushner, supra,* 101 *N.J.* at 400–01. Accordingly, our determination of the necessary sanction in disciplinary matters is "necessarily fact-sensitive." *Id.* at 400.

We view respondent's misconduct in this case as most serious, as falling below not only the standards required of attorneys in their private commercial dealings but below general marketplace norms of fair dealing as well. Consumed with the prospect of owning HLW, respondent subverted basic tenets of honesty to his own personal and selfish interests. This dishonesty, coupled with respondent's breach of his obligation to warn Ferber of the need for independent counsel at the outset, resulted in a substantial loss to the Ferbers' estates. Respondent's knowingly false testimony, albeit given in the capacity of a litigant, nonetheless "is a fundamental breach of a lawyer's duty as an officer of the court * * * [striking at] the heart of every attorney's obligation to uphold and honor the law." *In re Kushner, supra,* 101 *N.J.* at 401 (quoting *In re Schleimer, supra,* 78 *N.J.* at 319 (1978)).

Several factors, however, counsel that we stay our hand short of disbarment. Unlike the continuing or multiple instances of fraud and deceit that warranted disbarment in *In re Smyzer, supra,* 108 *N.J.* 47, *In re Servance, supra,* 102 *N.J.* 286 and *In re Bricker,* 90 *N.J.* 6 (1982), respondent's fraudulent conduct was limited to a single transaction; apart from these events his record as an attorney is unblemished. *See, e.g., In re Kushner, supra,* 101 *N.J.* at 400 (evidence of "prior trustworthy professional conduct" may mitigate damage to integrity of bar); *see also In re Schleimer, supra,* 78 *N.J.* at 319 (noting relevance of substantially unblemished previous record); *In re Hurd, supra,* 69 *N.J.* at 330 (same). Further, rather than counselling a client to invest in a losing commercial proposition in an attempt to protect the attorney's own interests, conduct we deem just short of misappropriation, *e.g., In re Smyzer, supra,* 108 *N.J.* at 57 (disbarred); *In re Wolk, supra,* 82 *N.J.* at 335 (same), respondent harbored a genuine belief that the

venture would reap substantial rewards for both him and Ferber; indeed his inflated evaluation of HLW led him to burden the company's prospective cash flow beyond repair.[11] In sum, we are not inclined to view this as a case of an attorney "hoodwinking * * * clients out of funds in a business venture that is essentially for the benefit of the lawyer." *Ibid.*

Our focus on the protection of the public and the preservation of its confidence in the bar renders significant the attenuated nature of the relationship between respondent's misconduct and the practice of law. *See In re Stier, supra,* 108 *N.J.* at 456–57 (where attorney filed false documents with registrar of deeds on behalf of clients court noted that infractions "arose from the lawyer-client relationship and were directly related to the practice of law"); *In re Pleva, supra,* 106 *N.J.* at 647 (where attorney was convicted of drug possession and falsification of firearm purchase application court noted that "misconduct was not directly related to the practice of law"). Although Ferber and respondent related generally as attorney and client, and respondent failed in his responsibilities owed to Ferber as a client, *supra* at 213–217 (discussing *DR* 5–104(A)), none of the misconduct arose out of practice-related powers or tasks. Compare *In re Wilson, supra,* 81 *N.J.* 451 (misappropriation of client trust funds). In this regard it is also significant to note that Ferber, who was not unconversant in dealing with attorneys, apparently voiced no complaints whatsoever concerning respondent's professional conduct before his death, eighteen months after the HLW closing.

Finally, the passage of time that has occurred since the relevant conduct mitigates the severity of the requisite disci-

---

[11]Respondent's thinking in this regard is exemplified by the Board's revelation that in addition to the 25% interest the Weir Group was to receive on its $100,000 loan, respondent agreed at the closing "to pay the Weir Group $200,000 annually from HLW profits if the proposed [15%] partnership were not formed within four years * * * [and] to provide a principal of Weir with a 4–year 'consulting contract' worth $227,500, the proceeds of which were to inure to the benefit of the Weir Group." *Supra* at 204.

pline in two respects. The most significant events at issue in this case occurred in the Winter and Spring of 1979, over nine years ago. Only last term in *In re Kotok, supra,* where nearly ten years separated the ethical infractions and finalization of discipline before this Court, we expressed that in such situations

> we are impelled to consider the efficacy of any sanction in light of the amount of time that has passed since the ethics violations occurred. If the ethics transgressions are remote in time, intervening developments and current circumstances may require an assessment of whether usual sanctions, otherwise appropriate, will effectively serve the purposes of discipline. [108 *N.J.* at 330].

*Accord In re Stier,* 108 *N.J.* at 460 (following *Kotok*); *In re DiBiasi,* 102 *N.J.* 152, 155 (1986) (eight years between crime and final discipline is mitigating factor); *In re Verdiramo,* 96 *N.J.* 183, 187 (1984) (where ethical infractions are eight years old "the public interest in proper and prompt discipline is necessarily and irretrievably diluted by the passage of time").

Furthermore, as noted, respondent has been suspended from practice in this state for over six years. Such a suspension "is unusual and, because of its severity, has been compared to disbarment." *In re Templeton,* 99 *N.J.* 365, 376 (1985); *see In re Verdiramo, supra,* 96 *N.J.* at 187. In the interim respondent has seemingly made gains towards rehabilitation. He has continued to practice before the Patent and Trademark office without incident, and has passed the ethics portion of the Florida State Bar examination. Further, respondent cooperated fully in these proceedings and has largely acknowledged the seriousness of his transgressions.[12] In such circumstances, the rehabilitation facet of the disciplinary process "has in some measure been accomplished through the passage of time."

---

[12]For example, with reference to *DR* 5–104(A) respondent testified that "I realize I made a grave mistake in my judgment, that Robertson should have been informed to the umpteenth degree. I should have refused to even meet with Ferber on anything but a social basis." Respondent acknowledged that much of what he did was absolutely wrong, and expressed that he had no desire to ever again attempt a role in a complex business transaction.

.Disbarment or a further term of suspension may be unnecessary or even "counter productive," *In re Kotok, supra,* 108 *N.J.* at 331, and would likely smack of vindictiveness rather than justice. *In re Verdiramo, supra,* 96 *N.J.* at 187.

These related factors, and reference to our prior cases involving fraudulent conduct and false swearing, suggest that retroactive discipline is an appropriate choice of punishment in this case. *See In re Simeone,* 108 *N.J.* 515, 522–23 (1987) (serious and numerous infractions falling just short of knowing misappropriation; retroactive six year suspension); *In re Kotok, supra,* 108 *N.J.* at 330 (discussing propriety of retroactive discipline); *In re Pauk,* 107 *N.J.* 295, 302–06 (1987) (four-year retroactive suspension was sufficient discipline for five-year span of ethical transgressions involving "a pervasive pattern of neglect, misrepresentation, and overreaching"); *In re Noonan,* 102 *N.J.* at 165 (retroactive five-year suspension ordered for respondent guilty of nine instances of misconduct involving neglect of legal matters, failure to properly maintain books and records, and conduct adversely reflecting on fitness to practice); *In re Kushner, supra,* 101 *N.J.* at 402–403 (three-year retroactive suspension ordered for respondent convicted of false swearing as a civil litigant); *In re Schleimer, supra,* 78 *N.J.* at 319 (respondent convicted of false swearing as civil litigant given one-year suspension). We acknowledge that respondent's inexcusable lack of candor during the civil trial came three years after the primary misconduct at issue, and thus to some extent negates the suggestion that the latter was aberrational. Nevertheless, based on our thorough scrutiny of the entire record, we are not convinced that the ethical violations in this case are of such a magnitude as to establish that respondent's professional career must be terminated. Hence we decline to accept the recommendation of disbarment, and order instead that the six-plus years respondent has been suspended from practice in this State constitutes an appropriate discipline. Respondent is directed to reimburse the Ethics Financial Committee for appropriate administrative costs.

*For Suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN join—7.

*Opposed*—None.

ORDER

This matter having been duly considered by the Court, it is ORDERED that the suspension of MELVIN SILVERMAN, formerly of CLIFTON, who was admitted to the bar of this State in 1970, from the practice of law by Order of the Supreme Court dated June 24, 1982, be deemed appropriate discipline for his violations of *DR* 1–102(A)(3), *DR* 1–102(A)(4), and *DR* 5–104(A); and it is further

ORDERED that respondent may seek to be restored to the practice of law pursuant to *Rule* 1:20–11(h); and it is further

ORDERED that MELVIN SILVERMAN reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of these proceedings.