### IN THE MATTER OF ALPHONSE MAKOWSKI, AN ATTORNEY-AT-LAW.

Argued January 27, 1976—Reargued January 11, 1977— Decided May 24, 1977.

266

*Mr. Robert E. Cowen* argued the cause for Central Ethics Unit.

*Mr. J. Albert Mastro* argued the cause for the Somerset County Ethics Committee.

*Mr. Richard A. Norris* argued the cause for respondent.

PER CURIAM. This disciplinary action was instituted when one of respondent's clients complained to the Somerset County Ethics Committee that respondent had appropriated to his own use money she had given to him to invest. The County Ethics Committee referred the matter to the Central Ethics Unit for investigation. An accountant employed by the latter to examine respondent's books reported irregularities in his "trust account" which led to the filing of an additional complaint against him by the Chief of the Central Ethics Unit. The two complaints were consolidated and a hearing held before the Somerset County Ethics Committee, which thereupon submitted a presentment to this Court.

I

The original complaint was brought by Mrs. Helen Banas. She and respondent were lifelong friends, and over the years he had done occasional legal work for her apparently without charge. In 1963 Mrs. Banas, a widow with money to invest, indicated to respondent that she would be interested in "some good first mortgages." For about four years thereafter, Mrs. Banas from time to time turned over funds to respondent which he then lent to other persons, at least some of whom were his clients, usually on the security of

mortgages given by the borrowers. Most of the loans have been fully repaid, with interest. At the time of the complaint, two loans remained at least partially unsatisfied, and one of the borrowers had left town and could not be traced. Respondent testified, however, that he had personally guaranteed every loan. A written agreement of guaranty dated January 3, 1968 supported this assertion.

In addition to investing her money in this way, respondent at various times borrowed a total of $23,000 of Mrs. Banas' funds on his own account. She testified that she never knew in advance to whom her funds were to be lent, but left such matters entirely in the hands of respondent, whom she regarded as the primary source for repayment of the loans. She was concerned only with earning an income from her investments. She learned the details of the loans only after they had been consummated but testified that she had no objection to this course of practice. It seems clear that she would not have instituted her complaint had it not been for the tardiness in making full repayment.

In an effort to settle the matter with Mrs. Banas, respondent entered into a written agreement with her on January 26, 1976, the eve of his first appearance before this Court. The agreement provided, *inter alia,* that if the total sum due — as to which there was no dispute — had not been repaid by September 15, 1976, Mrs. Banas might then enter a consent judgment against respondent in the stipulated amount. Each party later claimed that the other repudiated the agreement. While it eventually developed that this dispute was not a matter of our immediate concern, it may be noted that it did provoke a second hearing before this Court and considerably protracted these proceedings. Finally, on December 17, 1976 respondent paid Mrs. Banas a total of $41,853.69, including interest and an agreed counsel fee of $1,500.

Despite his personal friendship with Mrs. Banas and the fact that he seldom if ever charged her for the legal work he performed for her, there is no doubt that respondent and

Mrs. Banas stood in an attorney-client relationship. Whether or not a fee is paid, one who assumes to give legal advice takes on the role of an attorney. *Shoup v. Dowsey*, 134 *N. J. Eq.* 440, 475–76 (Ch. 1944). The fact that the advice in this instance was more of a business than of a legal nature, does not relieve respondent of a duty to adhere to the high ethical standards exacted of a lawyer. *In re Carlsen*, 17 *N. J.* 338, 345–46 (1955). The evidence clearly shows that respondent lent his client's funds to other clients and to himself without first disclosing, in each instance, exactly what he proposed to do, without explaining to her the possible conflicts of interest that might arise, or suggesting that she might be wise to take the advice of independent counsel. Such conduct violates *DR* 5–101(A), *DR* 5–104, and *DR* 5–105(B) as well as prior Canon 11. Were this the extent of respondent's misconduct it would possibly have deserved no more than a reprimand or brief suspension. But the second count charged against him is more serious.

## II

During the investigation of Mrs. Banas' complaint the Central Ethics Unit found it necessary to employ a certified public accountant to examine respondent's records. He reported that respondent maintained two bank accounts. One, which was denominated an "attorney's account," was intended by respondent, and understood by the bank officials who opened it for him, to be a trust account. The other was used for all other business and personal purposes. The accountant found that the "attorney's account" had been for many years "out of trust"; that is, the total amount in the account was less than the total of the funds entrusted to respondent by clients.

The reasons for this situation were three-fold. First, respondent was in the habit of drawing checks on the trust account to cover a client's expenses before the client had made the corresponding payment. Second, he had frequently

drawn on the account to cover personal and business expenses, repaying the sums as he was able. Third, the account had been debited by the bank for the unpaid balance of a personal loan, and had also been levied upon by the Internal Revenue Service for unpaid income taxes. Despite these depletions of the account, very few checks had been returned for insufficient funds, this circumstance being largely due to the existence in the account of a "float": a relatively large sum from a bankrupt estate on which no demands were made for a considerable period of time.

It seems clear from the record, and was found as a fact by the Ethics Committee, that this commingling by respondent of his clients' funds with his own did not stem from any dishonest or improper intent on his part. The accountant testified that he found no indication of any effort to conceal, and that every transaction was reflected somewhere in respondent's office records. Rather, the irregularities were due to respondent's imperfect understanding of the nature of an attorney's trust account and his obligations with respect thereto. This lack of comprehension helped materially to create the confusion which resulted in the seizure of trust funds by the bank and the Internal Revenue Service.

Although respondent's improper course of practice in this respect seems clearly to have been the product of ignorance rather than design, this will in no way suffice to absolve him. The standard of conduct demanded of a member of the bar is not a subjective, but an objective one. *In re Giordano*, 49 *N. J.* 210, 222 (1967). His failure to maintain the integrity of his trust account undoubtedly violated *DR* 9–102 and prior Canon 11, which was in effect at the time of his actions. We note, however, that since he has become aware of his responsibilities, respondent has made every possible effort to live up to them. With the assistance of Mr. Cohen, the accountant, he has set up a modern bookkeeping system which enables him to keep track of his clients' funds. No client, including Mrs. Banas, has been harmed by his concededly careless and unethical practices. He restored $44,000

to the trust account within a very short time of the deficiency being established. In addition, the chief of the Central Ethics Unit has requested this Court to take into consideration that respondent has been extremely cooperative and has reimbursed the Central Ethics Unit for the $1,046 charge for Mr. Cohen's services.

The ultimate objectives of imposing a disciplinary measure are "the protection of the public, the purification of the bar and the prevention of a re-occurrence." *In re Baron,* 25 *N. J.* 445, 449 (1957). Failure to maintain proper books and bank accounts, *R.* 1:21–6, has long been recognized by this Court as a most serious dereliction, and especially is this so where commingling results. The testimony indicates that for probably more than 15 years respondent, to a greater or less extent, commingled his personal funds with trust monies held by him on behalf of clients. For part of this time the account was insufficient in amount to have met all fiduciary obligations had payment been demanded. To place the account in balance required the substantial addition of about $44,000.

Giving full weight to the mitigating circumstances mentioned above, we find respondent's misconduct so serious as to justify no less than the imposition of a suspension from the practice of law for a period of six months and until the further order of this Court. It is so ordered.

*For suspension for six months*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD—7.

*Opposed*—None.

# ORDER

It is ORDERED that ALPHONSE MAKOWSKI of North Plainfield be suspended from the practice of law for six months and until further order of the Court, effective June 13, 1977 and it is further.

ORDERED that ALPHONSE MAKOWSKI be and hereby is restrained and enjoined from practicing law during the period of his suspension.