Alice SHELDON, Plaintiff, Appellee,

v.

FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF PUERTO RICO, Defendant, Appellant.

No. 77–1008.

United States Court of Appeals, First Circuit.

Argued Oct. 4, 1977.

Decided Dec. 15, 1977.

Carlos G. Latimer, with whom Ramirez, Segal & Latimer, San Juan, P. R., was on brief, for defendant, appellant.

Roberto J. Matos, San Juan, P. R., for plaintiff, appellee.

Before ALDRICH and CAMPBELL, Circuit Judges, and CRARY, District Judge.*

ALDRICH, Senior Circuit Judge.

Alice Sheldon, plaintiff appellee, was swindled of $84,000 by one Daniel Davila. Since Davila, a large scale operator, was judgment-proof, she sued her stockbrokers because their representative, Hodges, had recommended Davila and his enterprise, and defendant appellant, First Federal Savings & Loan Association of Puerto Rico, of which Davila was senior vice-president, a director, and a member of the loan committee. In her complaints to the FBI and to the bank, and in her original complaint filed in the district court, plaintiff claimed that Davila had embezzled her money. Discovering that the statute of limitations had run on an action ex delicto, she amended her complaint to allege breach of contract by the bank, on which the Puerto Rico statute had not run. The court permitted that action to go to the jury, in the form of a number of special interrogatories.

The questions pertinent to the claim against the bank, the only defendant with which we are concerned, were as follows.

1. Do you find that Alice Sheldon deposited $53,000 in First Federal on July 23, 1970? 2. Do you find that Alice Sheldon loaned First Federal $53,000 on July 23, 1970? 3. Do you find that Alice Sheldon loaned Daniel Davila $53,000 on July 23, 1970?

4. Do you find that Alice Sheldon deposited $31,000 in First Federal on August 25, 1970? 5. Do you find that Alice Sheldon loaned First Federal $31,000 on August 25, 1970? 6. Do you find that Alice Sheldon loaned Daniel Davila $31,000, on August 25, 1970?

The jury first answered questions 1, 2, 4 and 5 in the affirmative and questions 3 and 6 in the negative. Nothing on the question sheet indicated that questions 1 and 2, and 4 and 5 were in the alternative, and in its instructions the court told the jury to answer them all. When the answers were returned, and the inconsistency of answering both 1 and 2, and 4 and 5, in the affirmative was pointed out to the court, it sent the jury back to reconsider its answers, and to answer in the alternative. In addition, it stated that if the jury answered the first question in the affirmative, the bank would be liable, and if it answered question 2 in the affirmative it would not be, and the same as to 4 and 5. The jury thereupon answered questions 1 and 4 in the affirmative, and the court entered judgment for the plaintiff.

Although the court, in accordance with the questions, told the jury that "these monies may have been deposited as just a deposit, or an investment with the bank,"

* Of the Central District of California sitting by designation.

nowhere in its charge, or in the supplemental instructions, did the court inform the jury of the differences, either legal or factual, between a deposit and a loan, what tests it should apply, and what evidence, circumstances, or principles it should consider. This failure was especially prejudicial in view of the fact that plaintiff's own testimony was not consistent, and needed resolution. Findings based simply on which party the jury wished to have win the case were worthless.

Our present problem, however, goes deeper. We agree with the court's ruling, indeed, plaintiff does not dispute it, that if the jury should have answered the second and fifth questions in the affirmative, plaintiff cannot recover. Davila had neither real nor apparent authority to make a loan agreement on behalf of the bank, particularly of the type here testified to. Accordingly, the sole issue is whether there was evidence which, on a proper charge, would have warranted an affirmative answer to questions 1 and 4, an issue fully preserved by the bank's motion for a directed verdict. For this purpose we recite the evidence in the light most favorable to the plaintiff.

Plaintiff, a 68-year-old woman in poor health, sold her Virgin Islands gift shop, which she had conducted herself grossing over $100,000 annually for many years, and sought to make investments with her accumulated savings that would give her a good return. For this she came to San Juan, to see her brokers, who selected their employee, Hodges, to deal with her. He, in turn, introduced her to Davila. Over a joint luncheon Hodges informed her of Davila's position at the bank, and lauded his character and business ability. The touch was then made. According to plaintiff's testimony, Davila told her that the bank had two departments for lending money to business customers, a regular one that charged normal interest, but was slow in processing—two to three months—and a second, which granted interim loans very quickly, and accordingly commanded a higher rate. He stated, she said, that he was in charge of the second department, and that she

could deposit money in the first and then transfer it to the second and receive interest at 10 to 12%.

A. "[M]onies were put in one fund; the bank transferred them from one fund to another fund." Q. "And where was Mr. Davila's department of the bank, where would they obtain these funds to lend out?" A. "From investors, people that invest in banks."

Subsequently, on or about July 23, 1970, at a bar at the Caribe Hilton, plaintiff gave Davila a check in the amount of $58,700 endorsed in blank, but bearing the designation, "Deposit to account of the First Federal Savings and Loan Association of Puerto Rico." In return he gave her a First Federal Savings Certificate dated July 23, 1970, in the same amount. By the certificate the bank agreed to pay 6% interest, quarterly, unless plaintiff sought to redeem in less than two years, in which event there would be a partial forfeiture of interest. The certificate further provided that amounts might be borrowed by plaintiff against it, at 7% interest, without forfeiture of the 6% interest payable on the total certificate.

In addition to the certificate, Davila presented plaintiff with a promissory note form payable to the bank, dated July 23, in the amount of $53,000, to be charged against the certificate, at 7%. Plaintiff executed the note and he gave her the bank's check in the amount of $53,000.

Pausing here, we can only speculate on Davila's motives for persuading plaintiff to adopt this particular procedure, as well as wonder at plaintiff's ready compliance. The apparent purpose of being able to borrow against a certificate is to avoid, at a calculated cost, having to surrender the certificate prematurely and forfeit accumulated interest. Plaintiff, perhaps impressed by Davila's account and promise of high interest, may not have read anything she signed, in disregard, incidentally, of her duty of due care, if she wishes to claim apparent authority. *Seacoast Elec. Co. v. Franchi Bros.*, 1 Cir., 1971, 437 F.2d 1247. If she had, it was evident on the face of things

that she was borrowing back her own money at the very moment she was parting with it, and paying for the privilege.

Whatever may have been plaintiff's thinking, she was now in possession of a check for $53,000. Although her testimony was that she intended it to go back to the bank, in Davila's department, she gave it to Davila endorsed in blank, without any restriction as to deposit.

Q. "For what purpose did you have, did he say that you had to sign the papers?"
A. "Well, it was to transfer the monies from one account to another in the bank."

Davila gave her no receipt, or papers of any kind, but, later, sent her in the mail his personal promissory note in the amount of $53,000, bearing interest at 10%, together with a policy of life insurance on his life, both of which documents she put away in a drawer.

Thereafter, on or about August 25, 1970, plaintiff, having obtained from various sources an additional sum of $31,000, gave it to Davila during a party at her guesthouse. In this instance there was no savings certificate rigmarole, but simply an out and out delivery without restriction. Davila allegedly agreed to place these funds in his special department in the bank, but, again, there was no writing. Plaintiff requested none, and although she had thought Davila's previous furnishing his personal note and insurance policy "peculiar," she made no inquiry.

Purely as a matter of evidence we may wonder what basis there was for a finding that plaintiff intended either the bank's $53,000 check payable to her, or her $31,000 monies, as "just a deposit" in the bank. The word "deposit" appears in no one's testimony, or on any exhibit, except in connection with the original $58,700 check, which was, concededly, a deposit.[1] Plaintiff referred to her transaction throughout as an "investment," to a "loan." However, we will not resolve this question,[2] but consider the case on the basis of a simple deposit, the issue being the existence of Davila's authority, actual or apparent, to accept sizable cash deposits on behalf of the bank, not acknowledged, defined, or restricted by any writing, at a hotel bar or someone's apartment.

In the court's charge to the jury, and again in plaintiff's brief, appears the following. "A bank is responsible for a deposit delivered to an officer of a bank at a place outside the bank if the deposit is in fact received by the bank." This, of course, could not help the jury, and does not help us, as the bank never in fact received the funds. The question is whether Davila possessed such authority, or appearance of authority, a vis-a-vis the bank, that receipt by him under such circumstances was the legal equivalent of receipt by the bank.

The burden of proving actual authority on the part of Davila was on plaintiff, *Ferro Concrete Constr. Co. v. United States,* 1 Cir., 1940, 112 F.2d 488, 491, *cert. denied,* 311 U.S. 697, 61 S.Ct. 136, 85 L.Ed. 452, and she in no way succeeded. A bank witness expressly denied it. Authority was not conferred by the mere fact that Davila was an officer; nor by the circumstance that on special occasions he was sent out to factories to open small employee accounts. For an employee of a bank to receive large sums of unrestricted cash at hotel bars and thereby make the bank liable, there must be special circumstances.

Nor has plaintiff shown sufficient special circumstances evidencing apparent authority, given the fundamental rule that apparent authority cannot be established by the putative agent's own words or conduct, but only by the principal's. *Brownell v. Tide Water Associated Oil Co.,* 1 Cir., 1941, 121 F.2d 239. Plaintiff lists what she terms four reasons: the bank's issuance of plaintiff's certificate; its issuance of the $53,000

---

1. For the record, we note that this deposit, evidenced by the certificate, has been repaid in full; in part by the cancellation of plaintiff's $53,000 note, and the balance by outright payment.

2. Also, we need not reach defendant's complaint of frequent irrelevant interjections by the court critical of banks in general, and this one in particular.

check; "the holding out of Mr. Davila as one of its officers, directors, and as a member of its loan committee;" and "having his photograph taken as Vice-President with the Board of Directors." As to this last, however much the photograph may have constituted window dressing that appealed to the plaintiff, it is no more than a repetition of the third reason. As to that, if being an officer did not import actual authority, it could not, standing alone, be the basis for apparent authority.

There remains the matter of the bank's issuance of the savings certificate and the $53,000 check. We cannot conceive that this circumscribed transaction would indicate to a person exercising due care, *Seacoast Elec. Co. v. Franchi Bros.*, ante; *Anheuser-Busch v. Grovier-Starr Produce Co.*, 10 Cir., 1942, 128 F.2d 146, 152; Restatement of Agency (Second) § 27 (1958), and not simply to one whose senses had been dulled by the putative agent, general authority to receive unrestricted funds outside the bank. No bank could possibly, as a matter of safe practice, confer such broad authority. It can hardly be thought that a bank officer, no matter what his position, could be permitted to pick up an unverified amount of cash and walk out, with the bank to have nothing but his word for the amount taken, and his personal honesty as security. Banking is not conducted that way, and could not be. Rather, in addition to security requirements, there are entries, books, and records, and elaborate supervision. Even that hypothetical procedure, however, would be safer from the bank's standpoint than blanket authority for an officer to receive money outside the premises of which the bank had no knowledge or record to begin with. If the officer in such instance did not account, the bank would not even know there was a shortage, or what its liability was.

The limited transaction for which the bank actually entrusted Davila in connection with plaintiff had no such free wheeling characteristics. Davila was to deliver to plaintiff the savings certificate upon the receipt of her $58,700 check, and the bank's $53,000 check upon the receipt of her note.

This was an entirely defined, recorded in advance, and immediately verifiable set of transactions. True, a dishonest Davila could have given the plaintiff the certificate without receiving her check, and the bank's check without receiving her note, but in either instance, the bank would have known it immediately. At best, the bank might have stopped payment on its check and refused to honor the certificate. At worst, it would at least know the extent of its losses, and could take steps. But of primary importance, the bank was protected against either eventuality by the certain fact that Davila would know that his career would be forfeited. A person as bemused as plaintiff might think of none of these things, but to a reasonable person considering Davila's restrictions, as compared with general authority to deal with free funds outside the bank, the differences should have been evident. In reasonable appearance, Davila was simply a messenger trusted with a specific errand, with control at both ends. By conferring upon Davila authority to engage in that limited transaction, the bank did nothing to indicate its expectation that the $53,000 check was coming back to it, but just the reverse. Plaintiff's misfortune was not a deposit legally chargeable to the bank.

For reasons we need not pursue, plaintiff's claim with respect to her subsequent $31,000 payment is even more unsupportable. Her original analysis, that Davila had embezzled her money, was the correct one. The jury's answers to interrogatories 1 and 4, and the judgment for the plaintiff, must be vacated, and judgment be entered for the defendant.