Warren B. SHEINKOPF,
Plaintiff, Appellant,

v.

John K.P. STONE III, etc.,
Defendant, Appellee.

No. 90–1838.

United States Court of Appeals,
First Circuit.

Heard Jan. 10, 1991.

Decided March 7, 1991.

Alexander H. Pratt, Jr., with whom Peabody & Arnold, Boston, Mass., was on brief, for plaintiff, appellant.

James R. DeGiacomo, with whom Susan J. Baronoff and Roche, Carens & DeGiacomo, Boston, Mass., were on brief, for defendant, appellee.

Before TORRUELLA and SELYA, Circuit Judges, and POLLAK *, Senior District Judge.

SELYA, Circuit Judge.

This case requires us to consider whether an entrepreneurial attorney, who unwisely conducts personal business from his law office, thereby implicates his partners, leaving them (and their law firm) liable for investments gone sour. Because the record will not support a finding that an attorney-client relationship came into being, and there does not seem to be any

* Of the Eastern District of Pennsylvania, sitting by designation.

other legal basis for a claim against the remaining partners or the firm, we affirm the entry of a summary judgment terminating the suit.

## I. BACKGROUND

The seeds from which this Venus flytrap sprouted were planted in 1987 when the Omni Group (Omni), a joint venture, was formed to develop real estate in Massachusetts and New Hampshire. Plaintiff-appellant Warren B. Sheinkopf was invited to join the venture by David Saltiel, then a partner in the Boston law firm of Nutter, McLennen & Fish (Nutter). Although more copious details of the transaction will emerge during our subsequent discussion of the issues, it suffices to say for now that Saltiel was an organizer of, and principal in, Omni; that Sheinkopf enlisted; and that, when Omni's projects encountered dire financial straits, Saltiel entered personal bankruptcy. Faced not only with the loss of his original investment but also with incremental liability as a guarantor of several mortgages, Sheinkopf dove toward the deepest pocket in sight. Invoking federal question jurisdiction, 28 U.S.C. § 1331, he brought suit in the United States District Court for the District of Massachusetts against appellee John K.P. Stone III, individually and as a representative of the Nutter partnership, 741 F.Supp. 323.[1]

Appellant's amended verified complaint contained seven counts, including claims arising under various federal and state securities laws[2]; claims for aiding and abetting; and state-law claims for breach of fiduciary duty and fraud. The exact structure of the complaint is less important for our purposes than its unifying theme; six of the seven counts were premised on the theory that Nutter was vicariously liable for Saltiel's actions with regard to appellant's investment in Omni. Each of these six counts ended with the identical aver-

ment: "The partners of [Nutter] are liable for such acts and omissions by Saltiel, who was acting as one of its partners." Hence, irrespective of other distinctions anent the theories of liability asserted, all six counts depended upon Sheinkopf's ability to prove that Saltiel, acting as a member of the Nutter firm, either in the course of an attorney-client relationship or on Nutter's behalf and with its authority (actual or apparent), committed the acts and omissions of which Sheinkopf complained. The lone exception was count IV, which alleged Nutter's direct liability under the securities laws as a "controlling person" of Omni.

The district court wrote a thoughtful rescript, granting defendant's motion for summary judgment across the board. The court found insufficient record evidence to support the claim of an attorney-client relationship between Saltiel and Sheinkopf. Since Sheinkopf had no other links to Nutter, the court found for the defendant as a matter of law. No separate discussion of count IV was attempted.

## II. THE JURISPRUDENCE OF RULE 56

We begin our odyssey by revisiting sundry aspects of Fed.R.Civ.P. 56 which touch upon this appeal.

### A. *The Rule 56(c) Standard.*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Once the movant avers "an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), the latter must adduce specific facts establishing the existence of at least one issue that is both "genuine" and "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Local 48,*

---

1. Although Stone was the nominal defendant, the suit was in effect against the law firm. We shall, therefore, refer to the firm as if it, rather than Stone, were the defendant and appellee.

2. Among other statutes and regulations, the complaint cited sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (and Rule 10b–5 thereunder), sections 12(2) and 15 of the Securities Act of 1933, and comparable provisions of the Massachusetts Uniform Securities Act, Mass.Gen.L. ch. 110A, § 410(a)(2), (b).

*United Brotherhood of Carpenters v. United Brotherhood of Carpenters*, 920 F.2d 1047, 1050 (1st Cir.1990); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990). The mere existence of a factual dispute, of course, is not enough to defeat summary judgment. The evidence relied upon must be "significantly probative" of specific facts, *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11, which are "material" in the sense that the dispute over them necessarily "affect[s] the outcome of the suit." *Id.* at 248, 106 S.Ct. at 2510. In other words, the party opposing summary judgment must demonstrate that there are bona fide factual issues which "need to be resolved before the related legal issues can be decided." *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir.1989); *see also Local 48*, 920 F.2d at 1050–51.

■ This court's review of summary judgment is plenary. *Garside*, 895 F.2d at 48. In conducting our tamisage, we, like the district court, must view the evidentiary record in the light most hospitable to the nonmovant and must indulge all reasonable inferences in his favor. *See, e.g., Mack*, 871 F.2d at 181. We need not, however, give credence to "mere allegations," or draw inferences where they are implausible or not supported by "specific facts." *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. By the same token, we cannot accept, in lieu of documented facts, conclusory assertions, *Local 48*, 920 F.2d at 1051, or wholly anticipatory "promise[s] to produce admissible evidence at trial," *Garside*, 895 F.2d at 49.

### B. *The Standard for Obviating or Creating Fact Questions.*

Affidavits are the most conventional means of documenting facts for purposes of advancing, or opposing, summary judgment. *See Kelly v. United States*, 924 F.2d 355, 358 (1st Cir.1991); Fed.R.Civ.P. 56(c), (e)-(g). In this instance, defendant's Rule 56 motion was supported by two affidavits from David Saltiel.[3] Plaintiff's opposition, however, relied not upon one or more affidavits but upon the amended complaint, verified under oath by Sheinkopf.

■ There is some uncertainty as to whether, or when, a verified complaint can serve in lieu of an affidavit for purposes of opposing a summary judgment motion. See 6–Pt. 2, J.W. Moore & J.C. Wicker, Moore's Federal Practice ¶ 56.22[1] at 56–741 (suggesting that cases where a verified pleading will suffice are "rare"). This court has not heretofore had occasion to pass explicitly on the matter. We think the better rule is that a verified complaint *ought to be treated as the functional equivalent of an affidavit* to the extent that it satisfies the standards explicated in Rule 56(e) (in summary judgment milieu, affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein"). *Accord Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.*, 831 F.2d 77, 80 (5th Cir.1987); *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir.1985).

■ Applying this rule, we find that parts of Sheinkopf's verified complaint should be considered. The conclusory allegations do not pass muster, and hence, must be disregarded. *See, e.g., Fowler v. Southern Bell Tel. & Tel. Co.*, 343 F.2d 150, 154 (5th Cir.1965). On the other hand, the factual averments of the complaint, to the extent demonstrated to come within Sheinkopf's personal knowledge, were fully

---

**3.** In the court below, the plaintiff moved to strike certain portions of Saltiel's main affidavit on the ground that those portions set forth legal and factual conclusions rather than "such facts as would be admissible in evidence." Fed.R. Civ.P. 56(e). The district judge, finding the motion to "verge on the frivolous," rejected it. Though plaintiff has resurrected the issue on appeal, we find no need to dwell upon the point; because the disputed portions have no bearing on our findings here, we simply ignore them. *Accord William J. Kelly Co. v. Reconstruction Finance Corp.*, 172 F.2d 865, 867 (1st Cir.1949); 6–Pt. 2, J.W. Moore & J.C. Wicker, Moore's Federal Practice ¶ 56.22[1] at 56–748 to 56–749 ("[I]f [an] affidavit contains relevant material facts, although these are intermingled with conclusions of law, the court may disregard the conclusions of law and consider the rest of the affidavit.").

tantamount to a counter-affidavit, and hence, worthy of consideration. Because the record contains nothing of evidentiary significance beyond the Saltiel affidavits and the fact-specific segments of Sheinkopf's verified complaint, our decision must be premised on this limited factual record.

### C. *The Rule 56(f) Standard.*

If a summary judgment opponent regards an adversary's motion as premature because needed discovery is incomplete, Rule 56(f) provides a means of relief. The rule states:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f).

In this case, on the very day that he responded to the motion for summary judgment, the appellant served a request for admissions pursuant to Fed.R.Civ.P. 36. The Rule 36 request was concerned exclusively with a very narrow point: the existence and extent of bills rendered by Nutter to certain limited partnerships affiliated with, or somehow related to, Omni. At that time, the appellant also filed a conditional Rule 56(f) motion, buttressed by an affidavit, asking additional time for a specific purpose: receipt of the appellee's answers to the request for admissions or, if a dispute ensued, time to obtain the same information through other discovery devices. We think it is quite important to note that the Rule 56(f) motion was conditional. Sheinkopf asked for the extra time only "if the Court deems the matters covered by the Request to be material." The district court granted summary judgment before appellee responded to the request, never formally ruling on the Rule 56(f) motion. The court can, therefore, be assumed, impliedly, to have denied the mo-

tion, viewing the existence and extent of such invoices as immaterial.

■ Sheinkopf's Rule 56(f) motion need not occupy us for long; it suffers from a procedural virus which leaves it too fragile to carry any weight in this court. The appellant did not assign the failure to grant his Rule 56(f) motion (or any other preclusion of pretrial discovery, for that matter) as an error on appeal. He did not brief the topic in this court. Indeed, the circumstances surrounding the Rule 56(f) motion only surfaced at oral argument, under questioning by the panel. That was too little and too late. Under our settled practice, the point was waived. *See Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 397 (1st Cir.) (order denying rehearing) ("an appellant's brief on appeal fixes 'the scope of issues appealed' so that an appellant cannot resurrect an omitted claim 'merely by referring to it in a reply brief or at oral argument' ") (quoting *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 3 (1st Cir.1983)), *cert. denied,* —— U.S. ——, 111 S.Ct. 233, 112 L.Ed.2d 193 (1990); *see also Local 48*, 920 F.2d at 1055 n. 8 (to preserve issue for appeal, party must brief it and supply "developed argumentation"). We must, therefore, take the record as it stands.

■ At any rate, the district court's action seems fully supportable. For one thing, the grant or denial of a Rule 56(f) continuance always rests in the trial court's sound discretion. *Hebert v. Wicklund*, 744 F.2d 218, 222 (1st Cir.1984). Although a district court should generally apply the rule with some liberality, *id.*, the court has no duty to give a litigant more than the litigant seeks. Sheinkopf's motion was tentative and conditional. We see no abuse of discretion in the court's acceptance of the movant's stated invitation or its eschewal of a motion made under so strong an aura of ambivalence.

■ For another thing, the party seeking additional time for discovery under Rule 56(f) must show that the facts sought "will, if obtained, suffice to engender an issue both genuine and material." *Paterson–Leitch Co. v. Massachusetts Munici-*

*pal Wholesale Elec. Co.*, 840 F.2d 985, 988 (1st Cir.1988). Whether or not Nutter rendered bills for legal services to limited partnerships within Omni's sphere of influence was not relevant to, or probative of, the existence of an attorney-client relationship between Saltiel and Sheinkopf, and thus, was immaterial in respect to all counts other than count IV. *See Robertson v. Snow*, 404 Mass. 515, 536 N.E.2d 344, 348 ("An attorney for a corporation does not simply by virtue of that capacity become the attorney for . . . its officers, directors or shareholders."), *cert. denied*, —— U.S. ——, 110 S.Ct. 242, 107 L.Ed.2d 192 (1989) (quoting 1 R.E. Mallen & J.M. Smith, *Legal Malpractice* § 7.6 (3d ed. 1989)). Accordingly, there was no reason to grant the Rule 56(f) motion in connection with those claims.

■ A slightly different analysis is called for in connection with count IV. Certainly, the fact that Nutter may have performed legal services for, and billed, entities related to Omni, might have some arguable relevance to the issue of whether Nutter could be considered a "controlling person" as alleged in count IV. Yet, even if one assumes for purposes of count IV that Nutter did render such services and was paid for them, summary judgment on that claim would still be proper. *See infra* Part V. Because the admissions sought would not "affect the outcome" on count IV, they were not "material." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

## III. THE ATTORNEY–CLIENT RELATIONSHIP

Having cleared away the procedural bramble, we turn now to the appropriateness of *brevis* disposition on all counts other than count IV. We begin by examining the record to see if it will sustain the claimed attorney-client relationship between Sheinkopf and Saltiel.

Appellant has never asserted that there was an express agreement to provide legal services between him and Saltiel. Rather, he contends that the facts documented in his verified complaint were sufficient to prove the existence of an implied attorney-client relationship. Accepting the parties' shared view that Massachusetts law governs the issue, *see Moores v. Greenberg*, 834 F.2d 1105, 1107 n. 2 (1st Cir.1987) (when the parties agree on what substantive law controls, a federal court "ordinarily should" honor the agreement), the legal benchmark is clear. In the absence of an express contract to provide legal services:

> An attorney-client relationship may be implied "when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance. . . . In appropriate cases the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them and the attorney, aware of such reliance, does nothing to negate it."

*DeVaux v. American Home Assur. Co.*, 387 Mass. 814, 444 N.E.2d 355, 357 (1983) (quoting *Kurtenbach v. TeKippe*, 260 N.W.2d 53, 56 (Iowa 1977)). We proceed to apply this tripartite test to the properly documented facts, viewing the record, as Rule 56 demands, in the light most congenial to appellant.

### A. *The Facts.*[4]

■ Beginning in or about January 1987, appellant's long-time friend, Saltiel, then a Nutter partner, told him about the Omni joint venture. Appellant knew that Saltiel had organized many successful real estate deals. After a few informal conversations, once in a restaurant and other times over the telephone, appellant agreed to invest $100,000 in the joint venture. He told Saltiel that he wanted no personal liability for Omni's debts. Saltiel ac-

---

4. Many of the "facts" recited in this summary were directly contradicted in Saltiel's affidavits and/or hotly disputed by Nutter. Nevertheless, consistent with our view of the summary judg-ment standard, *see supra* Part II(A), we accept the plaintiff's account as true for purposes of this appeal.

quiesced, saying that he would "protect" Sheinkopf. On March 6, 1987, appellant gave Saltiel his check. Several months later, at Saltiel's request, appellant signed the signature page of the Omni Joint Venture Agreement (J/V Agreement) without having seen its text. Between August 1987 (when he executed the J/V Agreement) and September 1988 (when he withdrew from the venture by signing a document prepared by Saltiel), appellant guaranteed several loans made by lending institutions to Omni. In each instance, as in making his original investment and signing the J/V Agreement, Saltiel requested the action and appellant claims to have relied on Saltiel in taking it. Without meaningful description of specific words or phrases beyond what we have mentioned, appellant characterizes Saltiel's "advice" as "legal" in nature.

Although the above constitutes Sheinkopf's version of what occurred in the center ring, he also alleged, and personally verified, other "facts" which he contends are material in connection with the Rule 56 motion. These include the following: Saltiel told Sheinkopf that "other clients of [Nutter]" were included amongst the joint venture participants; many of Saltiel's dealings with appellant were transacted from Saltiel's office at Nutter; Saltiel's law-office secretary typed and/or delivered certain documents and relayed various messages; and Nutter's address was listed as Omni's principal place of business in the J/V Agreement. In addition, Sheinkopf swore that Saltiel neither advised him to seek independent legal counsel nor disclaimed that he (Saltiel) was giving legal advice to Sheinkopf in connection with the Omni deal.

Other facts are also worthy of mention. There was no evidence of any preexisting attorney-client relationship; Sheinkopf regularly used another Boston law firm and Saltiel knew as much. Furthermore, the record is barren of any evidence that appellant explicitly requested legal advice from Saltiel. It is equally devoid of any direct indication that Saltiel ever considered appellant to be his, or a Nutter, client (or treated him as such). Lastly, neither Nutter nor Saltiel ever billed Sheinkopf for legal services.

## B. *Discussion.*

These facts—whatever else they may prove—do not fit within the *DeVaux* integument. There is simply no plausible basis for implying an agreement to give legal advice or assistance. Phrased in the alternative idiom of *DeVaux,* the tendered proof is inadequate to support a finding that Sheinkopf "reasonably relie[d] on the attorney [Saltiel] to provide" legal services or that "the attorney, aware of such reliance, d[id] nothing to negate it." *DeVaux,* 444 N.E.2d at 357. On this chiaroscuro record, no reasonable factfinder could conclude either that appellant's purported reliance on Saltiel for "legal" as opposed to "investment" advice was reasonable or that Saltiel should have been aware that Sheinkopf would so rely.

Human beings routinely wear a multitude of hats. The fact that a person is a lawyer, or a physician, or a plumber, or a lion-tamer, does not mean that every relationship he undertakes is, or can reasonably be perceived as being, in his professional capacity. Lawyers/physicians/plumbers/lion-tamers sometimes act as husbands, or wives, or fathers, or daughters, or sports fans, or investors, or businessmen. The list is nearly infinite. To imply an attorney-client relationship, therefore, the law requires more than an individual's subjective, unspoken belief that the person with whom he is dealing, who happens to be *a* lawyer, has become *his* lawyer. If any such belief is to form a foundation for the implication of a relationship of trust and confidence, it must be objectively reasonable under the totality of the circumstances. We agree with the court below that this threshold was not crossed in the instant case. A reasonable businessman in Sheinkopf's shoes might have assumed that Saltiel had become his real estate guru, his business partner, his investment adviser, or even his fugleman— but no reasonable businessman would have assumed, on these facts, that Saltiel had become his attorney.

Appellant's assertion that such a relationship came into being rests on little more than his subjective belief, bolstered only by his recollection of a general conversation, unanchored in time or place, concerning his desire to avoid personal liability in the Omni venture and Saltiel's assurance that he would "protect" appellant. We find nothing in such an exchange, however construed, suggesting that Saltiel (himself an investor in, and organizer of, Omni) thereby became appellant's attorney or agreed to furnish *legal* advice. At the very most, the comment was ambiguous, consistent with the role of either a legal or an investment adviser. Ambiguity of this sort is not enough, *see, e.g., Clauson v. Smith,* 823 F.2d 660, 663 (1st Cir.1987) ("reliance [cannot] be implied out of desultory palaver"), especially for a party who has the burden of proving the reasonableness of his reliance. *See Robertson,* 536 N.E.2d at 351; *see also Ralston Dry–Wall Co. v. United States Gypsum Co.,* 926 F.2d 99, 101–102 (1st Cir.1991) (to defeat summary judgment in suit on misrepresentation, plaintiff had to adduce facts to show it was justified in relying on the alleged misrepresentation); *see generally Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990) (in opposing summary judgment, nonmovant, on issues where he bears the burden of proof, must demonstrate "that specific facts sufficient to create an authentic dispute exist"); *accord Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Garside,* 895 F.2d at 48. In our view, Sheinkopf's recital of so amorphous an assurance on so uncertain an occasion does not amount to testimony from which a jury could plausibly find that either reasonable reliance or an implied attorney-client relationship had been proven by preponderant evidence.

By the same token, the assistance Saltiel subsequently rendered—obtaining appellant's check and having him sign various documents—fell equally, if not more appropriately, within Saltiel's professional competence as a promoter or investment adviser. It could scarcely have been reasonable for appellant, himself a successful entrepreneur, to give Saltiel a hefty check, blindly sign the signature page of the J/V Agreement, proceed to execute a series of loan guarantees patently inconsistent with any limitation of personal liability, and assume, nonetheless, that Saltiel had tacitly agreed to act as his attorney, and was doing so. In short, appellant's assertion that he reasonably relied on Saltiel *for legal advice* does not flow rationally from the evidence of what he, an experienced businessman, did with regard to investing in Omni. *Cf. Robertson,* 536 N.E.2d at 349 (evidence did not support finding of reasonable reliance on attorneys' implied misrepresentation).

The plaintiff's proof was wanting in another respect as well. Even if a putative client "reasonably relies on the attorney to provide [legal services]," an attorney-client relationship cannot be implied unless "the attorney, *aware of such reliance,* does nothing to negate it." *DeVaux,* 444 N.E.2d at 357 (emphasis supplied). We have searched the record in an effort to find a shred of evidence that a lawyer in Saltiel's position, knowing what he knew, might have been aware that Sheinkopf was looking to him for legal advice. We have discovered none. Everything that Saltiel knew pointed in precisely the opposite direction. There was no history of a preexisting attorney-client relationship; no fee arrangement in place (or even discussed); no retainer paid; no particularized discussions of the legal ramifications of the deal. Sheinkopf was regularly represented by other counsel.[5] Throughout, Sheinkopf said nothing which, fairly construed, indicated either that he was relying on Saltiel's legal acumen or that he considered himself to be Saltiel's client. In sum, the arrangement between the two men reflected none of the earmarks of an attorney-client relationship.

Appellant argues that public policy, and in particular the concern of preserving the integrity of the legal profession, favors an

---

**5.** Saltiel stated in his affidavit that to his knowledge "[Sheinkopf] and his business have for many years been represented by Peabody & Arnold, his present counsel's firm." Sheinkopf has not challenged the truth of this statement.

expansive view of the attorney-client relationship whenever a lawyer mixes personal business with his professional practice. In this regard, appellant leans heavily upon Massachusetts Disciplinary Rule 5–104(A).[6] But such reliance begs the question. Although Rule 5–104(A) is praiseworthy in concept and sound in principle, it is inapposite here. By its terms, the rule presupposes an existing attorney-client relationship; and, as we have just explained, there is no probative evidence of such a relationship involving Sheinkopf and Saltiel.[7] Thus, we have no principled choice but to reject appellant's attempt to bootstrap himself into the lee of the disciplinary rule.

What is more, notwithstanding the hortatory language of Rule 5–104(A), Massachusetts courts have neither taken a particularly expansive view of the attorney-client relationship nor strained to manufacture professional ties in the absence of hard evidence or compelling inference. In *Dolan v. Hickey*, 385 Mass. 234, 431 N.E.2d 229 (1982), the Massachusetts Supreme Judicial Court (SJC) decided that a lawyer who drafted documents in a transaction in which the mortgagors knew that he was representing other interests and who, after the mortgagors had executed those documents, was retained by them to draft a real estate trust, was not the mortgagors' attorney at the time the mortgage was executed (and thus did not have a fiduciary duty to disclose his interest in the transaction or to advise the mortgagors to seek independent counsel). "The possibility that the [mortgagors] nevertheless trusted [the attorney], and relied on his expertise in permitting him to draft the documents, does not establish a relationship of confidence." *Dolan*, 431 N.E.2d at 230.

In *Robertson*, no attorney-client relationship was implied between the law firm rep-

resenting a corporation in a corporate restructuring and the plaintiff, a former corporate officer who claimed that the firm had been negligent with regard to his expectation of continued employment in the reorganized company. There, the undisputed facts showed that the plaintiff had a preexisting attorney-client relationship with the lawyers (he had previously retained the firm to handle various matters, including the drafting of his will, which remained in the firm's custody), *Robertson*, 536 N.E.2d at 349; that he sincerely believed the law firm was representing his interests in the restructuring, *id.*; that he had specifically raised the issue of whether he would be employed in the new corporation at a meeting with the lawyers, *id.* at 347; and that he had requested and received from them a sample employment agreement. *Id.* Still and all, the SJC found this evidence insufficient:

> In spite of several written and many oral communications between the plaintiff and the other participants, the plaintiff introduced no evidence of a specific reference to [the firm] as his personal counsel. His claim is essentially, therefore, that he thought that [the firm] represented him but that he failed to communicate his thought to anyone.

*Id.* at 349. Citing uncontroverted testimony that plaintiff never explicitly requested the firm to represent him in the matter, never discussed the sample employment agreement with any of the attorneys, and was not invoiced for any legal services—the firm's services in connection with the reorganization were billed in their entirety to the corporation under a contract that made no stipulation for representation of officers—the SJC concluded that there was

---

**6.** The rule provides:
> A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

SJC Rule 3:07 (Canons of Ethics and Disciplinary Rules Regulating the Practice of Law), DR 5–104(A).

**7.** The cases cited by appellant in support of his policy argument are equally inapposite. Thus, for example, in *Phillips v. Carson*, 240 Kan. 462, 731 P.2d 820 (1987), the plaintiff had been the attorney's client for several years before the transaction in question took place. *Id.*, 731 P.2d at 826. *In re Makowski*, 73 N.J. 265, 374 A.2d 458 (1977), is cut from similar cloth; there, the lawyer had also done prior legal work for the complainant. *Id.*, 374 A.2d at 459–60.

"little basis to imply the existence of an attorney-client relationship." *Id.* at 351.

A ready analogy suggests itself. Here, the uncontroverted testimony shows that Sheinkopf never explicitly requested Saltiel or Nutter to represent him, never sought any legal advice from them, and was never billed for services. To paraphrase *Robertson*, his claim is, essentially, that he thought Saltiel represented him but that he failed to communicate his thought to anyone, Saltiel included, until well after the balloon went up. Moreover, Sheinkopf's claim is much weaker than the claims previously rejected by the SJC in *Dolan* and *Robertson*, inasmuch as Nutter, unlike the defendants in those cases, never represented the plaintiff in any prior or subsequent matter. Bearing in mind that "[i]n assessing detrimental reliance *vel non*, the test is one of objective reasonableness under the circumstances," *Henry v. Connolly*, 910 F.2d 1000, 1003 (1st Cir.1990), we do not think that, whatever the nature of Sheinkopf's subjective expectations about Saltiel's advice, a jury could supportably conclude that reliance was reasonable.

 The exhortation that Saltiel had an obligation to disclaim that he was acting as appellant's attorney in the Omni deal or to advise him to seek independent legal counsel does little to change the picture. Under the *DeVaux* test, an attorney is required to negate reliance on his advice only if he is aware of the putative client's reasonable reliance. *See DeVaux*, 444 N.E.2d at 357. In this instance, Sheinkopf's professed reliance was not only unreasonable, but uncommunicated; Saltiel was not actually aware that appellant was relying on him for legal advice. And the sockdolager, of course, is the absence of an objectively reasonable basis for implying any such awareness.

Finally, this is not the type of situation where a viable claim might lie that the attorney should be held liable for the "fore-seeable reliance" of a nonclient. *See, e.g., Page v. Frazier*, 388 Mass. 55, 445 N.E.2d 148 (1983); *Craig v. Everett M. Brooks Co.*, 351 Mass. 497, 222 N.E.2d 752 (1967). Under Massachusetts law, the doctrine of foreseeable reliance is limited to instances "where the defendant knew that the plaintiff would rely on his services." *Page*, 445 N.E.2d at 154 (quoting *Rae v. Air–Speed, Inc.*, 386 Mass. 187, 435 N.E.2d 628, 631 (1982)). As we have already indicated, there is no probative evidence showing that Saltiel knew or should have known that Sheinkopf was relying on him for legal counsel. Indeed, fully conscious that Sheinkopf was regularly represented in business transactions by another law firm, a reasonably prudent attorney in Saltiel's position would logically have assumed, given the lack of any contrary indication, that appellant was receiving legal advice about the joint venture from that firm.[8]

There is little point in flogging a moribund mare. Although usually applied in a different context, the established tenet that "contracts depend on objective manifestations of consent and not on uncommunicated subjective expectations," *see Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 853 (1st Cir.1987); *RCI Northeast Services Div. v. Boston Edison Co.*, 822 F.2d 199, 204 (1st Cir.1987), is clearly pertinent here. In the absence of any objective evidence that Saltiel undertook to act as Sheinkopf's attorney, or had agreed to do so, a contract to furnish legal services cannot be implied. The district court did not err in granting summary judgment on this basis.

## IV. OTHER SOURCES OF AUTHORITY

It is theoretically possible that, even in the absence of an attorney-client relationship, a law firm could be liable for a partner's actions in spheres beyond the practice of law if the firm authorized those actions to be taken on its behalf. In this case,

---

**8.** In this regard, we flatly reject appellant's assertion that the burden was on Saltiel to state outright that he was not acting as Sheinkopf's attorney. Though the SJC did say in *DeVaux* that "an attorney has a duty to prevent any mistaken reliance on his silence," 444 N.E.2d at 359 n. 12, this duty to speak is undoubtedly premised upon the correlative principle that even mistaken reliance must be reasonable, or at least foreseeable. As we have already indicated, appellant's alleged reliance, as a matter of law, did not satisfy these criteria.

Sheinkopf contends that he succeeded in raising a jury question about Nutter's culpability for Saltiel's misconduct, whether or not that misconduct occurred within the attorney-client framework. We do not agree.

 Under Massachusetts law, uninvolved partners are only liable to third persons for the wrongful acts or omissions of an involved partner "acting in the ordinary course of the business of the partnership, or with the authority of his co-partners." Mass.Gen.L. ch. 108A, §§ 13, 15; *see also Jurgens v. Abraham*, 616 F.Supp. 1381, 1387 n. 10 (D.Mass.1985). Based on the summary judgment record, Nutter's only business—if one may call a profession by so esurient an appellation—is the practice of law. The lack of a cognizable attorney-client relationship makes it crystal clear that Saltiel's alleged misconduct did not transpire "in the ordinary course" of Nutter's business. Hence, any remaining argument for vicarious liability must rise or fall on the presence of apparent authority.[9]

We think the record is clear enough that, in recruiting Sheinkopf into Omni and dealing with him thereafter, Saltiel acted without the appearance of Nutter's authorization. Under Massachusetts law, apparent authority "results from conduct by the principal which causes a third person reasonably to believe that a particular [actor] ... has authority ... to make representations as his agent." *Hudson v. Massachusetts Property Ins. Underwriting Ass'n*, 386 Mass. 450, 436 N.E.2d 155, 159 (1982). It is a "fundamental rule that apparent authority cannot be established by the putative agent's own words or conduct, but only by the principal." *Sheldon v. First Fed. Savings & Loan Ass'n*, 566 F.2d 805, 808 (1st Cir.1977); *accord McGarity v. Craighill, Rendleman, Ingle & Blythe, P.A.*, 349 S.E.2d 311, 313 (N.C.1986) ("The

scope of an agent's apparent authority is determined not by the agent's own representations but by the manifestations of authority which the principal accords to him."), *rev. denied*, 319 N.C. 105, 353 S.E.2d 112 (1987). Whatever Saltiel himself may have done, or omitted to do, in his campaign to enlist and retain Sheinkopf as an Omni member, there is nothing in the record that would support an inference that Saltiel was acting within the scope of his apparent authority as a Nutter partner. As a law firm, Nutter was not in the business of soliciting investments; there is no suggestion that Saltiel's acts in regard to Omni could have benefitted the law firm in any significant way; and, as we have already observed, there is no evidence that any other member of the firm knew or should have known that Saltiel had solicited Sheinkopf to put his hard-earned eggs in Omni's tatterdemalion basket.

At bottom, appellant's argument rests on the smattering of facts summarized *supra* p. 1265, e.g., Saltiel's use of his Nutter office, secretary, and stationery in dealing with Sheinkopf, to make out a jury question on apparent authority. But those few items cannot carry so much freight. *See Kanavos v. Hancock Bank & Trust Co.*, 14 Mass.App.Ct. 326, 439 N.E.2d 311, 315 ("Trappings of office, e.g., office and furnishings, private secretary, ... do not without other evidence provide a basis for finding apparent authority."), *rev. denied*, 387 Mass. 1103, 440 N.E.2d 1177 (1982); *see also Sheldon*, 566 F.2d at 808–09. There is no evidence that these amenities were provided to Saltiel for anything other than the practice of law. That Saltiel also made use of them in his personal business activities is hardly extraordinary, nor is it even remotely sufficient to cloak his ultracrepidarian activities with Nutter's apparent authority.[10]

---

9. While actual authority is a theoretical possibility in a case like this one, there is not an iota of evidence here that Nutter's other partners knew of Saltiel's role in snagging Sheinkopf as an Omni investor and guiding his actions thereafter, much less that they authorized Saltiel to act in that vein. There was no actual authority.

10. We thus find the situation at hand readily distinguishable from *DeVaux*, where the SJC held it to be for the jury whether, within the ordinary course of law-office business, "the attorney had placed his secretary in a position where prospective clients might reasonably believe that she had the authority to establish an attorney-client relationship." *DeVaux*, 444

We need not paint the lily. On this record, appellant could not reasonably have believed, based on any words or deeds of Nutter, that Saltiel was acting as its agent in respect to the investment.

## V. THE "CONTROLLING PERSON" QUESTION

 Sheinkopf's remaining count is premised on the theory that Nutter can be held liable as a "controlling person" under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78t, section 15 of the Securities Act of 1933, 15 U.S.C. 77o, and/or the analogous provision of the Massachusetts Uniform Securities Act, Mass. Gen.Laws ch. 110A, § 410(b). In the securities context, control means "the possession, direct or indirect, of the power to direct or to cause the direction of the management and policies of [an entity], whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (1990). An attorney can, in certain circumstances, be a "controlling person." *See, e.g., Seidel v. Public Service Co.*, 616 F.Supp. 1342, 1361–62 (D.N.H. 1985). For Nutter to be liable on this basis, however, there must be "significantly probative" evidence, *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11, that the firm exercised, directly or indirectly, meaningful hegemony over the Omni joint venture through Saltiel or otherwise. The evidence of record is insufficient to clear this hurdle.

Appellant's initial approach to "controlling person" liability is an obvious dead

end. Although appellant's submitted proof might well be adequate to establish that Saltiel himself was a controlling person of Omni, there are no facts in the record that would justify a reasoned inference that Saltiel, in exercising such control, did so for or on behalf of Nutter.[11] To the extent that Saltiel controlled Omni, it was in his personal capacity as an organizer and/or promoter of the joint venture, not in his professional capacity as an attorney and Nutter partner. *See supra* Parts III(B), (C).

Appellant's second approach also leads down a blind alley. While he does not assert that Nutter partners other than Saltiel were directly involved with Omni as principals, he says that, as lawyers, they had pervasive influence. In *Seidel*, the court found the plaintiff to have survived the minimal scrutiny required under Fed.R. Civ.P. 12(b)(6) where the complaint alleged that two law firms had participated in the preparation, review, supervision, and dissemination of offering documents containing material omissions and misstatements, which documents named the firms and bore the imprimatur of their expertise, and where, presumably, the issuer would have been amenable to following the firms' advice. *Seidel*, 616 F.Supp. at 1361–62. Appellant's attempt to implicate Nutter in a similar way is doomed by the inadequacy of the evidence which accompanies the attempt. We explain briefly.

In his verified complaint, appellant alleged "[u]pon information and belief," that

N.E.2d at 358. Saltiel, as a Nutter partner, undeniably had authority, both actual and apparent, to establish attorney-client relationships on the law firm's behalf. But, he did not do so in this instance. *See supra* Part III. Beyond that point, *DeVaux* is not particularly instructive on the issue of a firm member's apparent authority *outside* the ordinary course of the firm's business. At any rate, we are satisfied, for the reasons discussed in the text, that no showing of apparent authority sufficient to bind the firm in such non-law-related ventures has been advanced here. *See, e.g., McGarity*, 349 S.E.2d at 313–14 (law firm did not confer apparent authority on attorney to solicit investment funds); *Douglas Reservoirs Water Users Ass'n v. Maurer & Garst*, 398 P.2d 74, 76–77 (Wyo.1965) (summary judgment affirmed in favor of law firm where partner allegedly misappropriated check to purchase bond); *Rouse v. Pollard*, 130

N.J.Eq. 204, 21 A.2d 801, 804 (Err. & App.1941) (law firm not liable for partner's misapplication of funds given him by client for investment).

11. To be sure, appellant makes much of Saltiel's use of his Nutter office, telephone, secretary, and other firm facilities in his Omni dealings. But, it is not uncommon for persons, lawyers included, to use their employer's facilities to carry on dealings not related to, or within the scope of, their employment. In our judgment, such actions, when undertaken by a partner in a law firm with regard to his proprietary business interests, fall shy of supporting either an inference that the law firm "controlled" those interests or an inference that the person involved was functioning *qua* law partner in the course of his involvement.

the "offering documents" he received regarding the Omni joint venture "were prepared by, or with the substantial assistance and knowledge of, Saltiel *or* others at Nutter...." (Emphasis supplied). He identified the "offering documents" as comprising a projection sheet, appraisal report, and development proposal for a project in Nantucket, Massachusetts, and a business plan for a development in Laconia, New Hampshire. These averments do not help his cause. A verified complaint may be treated as an affidavit only to the extent that it comports with the requirements of Rule 56(e). *See supra* Part II(B). It is apodictic that an "affidavit ... made upon information and belief ... does not comply with Rule 56(e)." *Automatic Radio Mfg., Inc. v. Hazeltine Research, Inc.*, 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1949); *see also Chandler v. Coughlin*, 763 F.2d 110, 114 (2d Cir.1985); *Hurd v. Williams*, 755 F.2d 306, 308 (3d Cir.1985); *Chan Wing Cheung v. Hamilton*, 298 F.2d 459, 460 (1st Cir.1962). Thus, appellant's statement with regard to Nutter's purported role in the preparation of the offering documents amounts to nothing more that a mere allegation, not entitled to credence or weight in the summary judgment calculus.

What remains in the calculus is Saltiel's affidavit vouchsafing that "[n]o one at the firm assisted in preparing the so-called 'offering documents'...." This statement has not been rebutted or effectively impugned. In the absence of refutation or any probative evidence specifically showing the participation of other attorneys at Nutter *in the preparation of the offering documents*, the inescapable inference is that Saltiel was the only Nutter-based individual involved in drafting or publishing those papers.[12] Accordingly, summary judgment was warranted on count IV.

## VI. CONCLUSION

On the evidence of record, appellant failed to show either the existence of an attorney-client relationship or any other sound basis for vicarious liability on Nutter's part. Appellant likewise failed to establish that Nutter was a "controlling person" in respect to the joint venture.

We need go no further.[13] Though there may be reason enough for disapproving how Saltiel conducted his business affairs and for admonishing attorneys about the necessity of keeping personal entrepreneurial activities well separated from professional responsibilities, there are no grounds, on the factual record here, for holding Nutter, as a firm, legally liable for the investment advice given by its former partner. The judgment below must therefore be

*Affirmed.*

---

**12.** To be sure, Saltiel's affidavit also stated that "[o]ne or more attorneys at the firm assisted in drafting the Omni Joint Venture Agreement...." The J/V Agreement, however, was considerably different than the "offering documents" alleged by Sheinkopf to have contained material misstatements and omissions. A showing that Nutter drafted the J/V Agreement, received legal fees therefor, and allowed its office address to be inserted therein, without more, simply does not warrant a finding that Nutter was a culpable participant in, or a controlling person of, Omni.

**13.** Having no occasion to reach appellee's array of alternative grounds in support of the judgment below, we leave for another day, without opinion, the knotty question of whether, and under what circumstances, a joint venture interest may, or may not, be a "security" for the purposes of liability under the securities laws. *Compare, e.g., Williamson v. Tucker*, 645 F.2d 404, 424–25 (5th Cir.) (holding that joint venture interest was a security where circumstances showed that investor lacked the ability "to exercise meaningful partnership powers"), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), *with, e.g., Goodwin v. Elkins & Co.*, 730 F.2d 99, 103–08 (3d Cir.) (adopting bright-line rule that no general partnership formed pursuant to the Uniform Partnership Act is a security), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984). *See also Matek v. Murat*, 862 F.2d 720, 730–32 (9th Cir.1988) (offering yet a third view).